David Dene MARTIN

v.

Frank C. BLACKBURN, Warden, Attorney General of State of Louisiana.

Civ. A. No. 81–566.

United States District Court,
E. D. Louisiana.

Aug. 12, 1981.

---

5. The order of abandonment from the United States Geological Survey was issued on July 28, 1981.

Richard E. Shapiro, New Orleans, La., for plaintiff.

John Erny, Jr., Asst. Dist. Atty., 17th Judicial Dist., Thibodaux, La., for defendants.

## ORDER

JACK M. GORDON, District Judge.

This Court has carefully and personally considered petitioner's complaint, the entire state court record, the record of the hearings held before the United States Magistrate on the issues of ineffective assistance of counsel pursuant to the Court's order of April 1, 1981, the applicable law, the Report and Recommendation of the United States Magistrate dated July 17, 1981, and the objections to Report and Recommendation of Magistrate filed by petitioner on August 4, 1981. To the extent that the Report and Recommendation of the Magistrate represents a review of an application for post-trial relief pursuant to Rule 20.3c of the General Rules of the United States District Court for the Eastern District of Louisiana, this Court hereby approves the said Report and Recommendation and adopts it as its opinion herein. To the extent that the said Magistrate's Report and Recommendation represents the Magistrate's finding that petitioner received effective assistance of counsel in both the "guilt-innocence" stage of his trial and the "sentencing" phase of his trial, this Court, upon its examination of the record as hereinabove set forth hereby makes a de novo determination that the petitioner received effective assistance of counsel within appropriate constitutional minima.

A review of the different segments of the Magistrate's Report is appropriate in light of assertions made by petitioner in his objections. First, it is significant to note that this Court's order of April 1, 1981, affording petitioner an evidentiary hearing dealt solely with the issues of ineffective assistance of counsel, as set forth in a Magistrate's Report and Recommendation of the same date. In the Magistrate's April 1, 1981 Report and Recommendation the Magistrate stated to the Court: "While petitioner's other assertions are capable of disposition on the basis of the state court record,

that record is inadequate to determine the substance of petitioner's ineffective assistance of counsel assertions...." Thus, the only portion of the Magistrate's final Report to the Court dated July 17, 1981, which is subject to the provisions of 28 U.S.C. Section 636(b)(1)(C), is the Magistrate's Findings and Recommendations pertaining to petitioner's contentions regarding ineffective assistance of counsel in the two phases of his trial. All other portions of the Magistrate's Report and Recommendation are governed by Rule 10 of the "Rules Governing Section 2254 Cases in the United States District Court," effective February 1, 1977, as implemented by Rule 20.3c of the General Rules of the United States District Court for the Eastern District of Louisiana. In other words, they are designed to facilitate this Court's decision as to whether there need be a hearing on any other contentions.

Thus, although petitioner is not entitled to file objections under 28 U.S.C. 636(b)(1) to those portions of the Magistrate's Report and Recommendation other than those findings and recommendations dealing with the issues of ineffective assistance of counsel, this Court nevertheless has considered all of the objections filed by petitioner on August 4, 1981, and finds them to be without merit.

With regard to the issues of ineffective assistance of counsel for which the Magistrate conducted hearings, it is well to note that the Magistrate initially assigned the date of April 13, 1981, as the date to commence the evidentiary hearing. (See Magistrate's Minute Entry of April 3, 1981.) Thereafter at a preliminary conference on April 13, 1981, the Magistrate, at the request of counsel for the petitioner, continued the beginning of the evidentiary hearing to June 10, 1981, a period of approximately 60 days. Thereafter Mr. Shapiro, counsel for petitioner, again sought to continue the hearing, and at a June 3, 1981 conference the Magistrate agreed to continue the hearing in part. On June 9, 1981, counsel for petitioner filed list of witnesses, which included Mr. Ray Bass of Houston, Texas, who had been petitioner's privately

retained lead counsel in both phases of the state court trial. The Magistrate patiently listened to evidence on June 10 and 11, 1981, June 18 and 19, 1981, and June 26, 1981. On June 19, 1981, the Magistrate, over Mr. Shapiro's objection, ordered that Mr. Bass' testimony be taken over long distance telephone. It was noteworthy that at that time counsel for petitioner had had over three months to secure the testimony of Mr. Bass by deposition, but had only spoken to Mr. Bass on one occasion by telephone. (See page 25 of Transcript of Proceedings before Magistrate on June 19, 1981.) Moreover, at the conclusion of testimony on June 19, the hearing was recessed for another week until June 26, during which time counsel for petitioner could have obtained the deposition if the telephone examination were considered insufficient. The record reflects that counsel for petitioner took no action other than to again request of the Magistrate further delay of at least two weeks for the taking of Mr. Bass' formal deposition. (See pages 103, 104, Transcript of Proceeding Before Magistrate on June 26, 1981.)

This Court fully agrees with the Magistrate's decision in refusing further delay which would have been unconscionable in light of the extent to which the matter had already been drawn out by the aforesaid narrative of events and by extremely repetitive testimony of little probative value.

Next, petitioner objects to the Magistrate's failure to designate specific findings of fact as such. The Court finds no merit in this further attempt to prolong this proceeding by suggesting that the Court re-refer the matter to the Magistrate for further findings labeled as such. One must bear in mind that the sole purpose of the hearings ordered by this Court was to determine adequacy of counsel within constitutional minima. The Magistrate clearly made findings in this regard, and this Court after review of the transcript of the proceedings and the entire state court record has absolutely no difficulty in making a de novo finding that petitioner received adequate assistance in all phases of his trial. It is true that petitioner lost his case and was found guilty. He was not successful in persuading the jury of the existence of mitigating factors justifying a sentence of life imprisonment rather than death. This does not mean, however, that he did not receive effective assistance of his lawyers as he desired that assistance at the time of the various phases of his trial. Great caution must be taken not to judge the performance of his lawyers through hindsight. Every lawyer makes mistakes; but more than that, every lawyer who lost a case has mused, often painfully, "What if . . . ?"

It may be as suggested by petitioner's present counsel that petitioner might not now face the supreme penalty for his heinous acts if different strategy or tactics had been adopted at the time of the trial. But when this Court examines the entire proceeding of the trial along with the challenged behavior and decisions of counsel in the context of the law and other controlling circumstances as they existed at the time, I am left with the strong conviction that counsel rendered effective assistance, particularly in light of the petitioner's insistence concerning the manner in which his defense be conducted.

This Court has been presented with a laundry list of alleged defects cleverly designed, in the opinion of this Court, to frustrate society's sacred rules by extending into perpetuity lawyers' arguments concerning the protections to be afforded one facing the supreme penalty. It is no wonder that many citizens, when considering matters of this nature with a common sense unbesmirched by the sophistry of the law, have concluded that our legal system is incapable of protecting society from wanton acts of violence and uncivilized behavior such as is reflected in the record of petitioner's conduct on August 14, 1977. Petitioner has had his day in court, has had ample opportunity to introduce evidence relating to the issues of ineffective assistance of counsel, has had multiple careful consideration of his statutory and constitutional arguments, and it is time that society's mandate be carried out.

Accordingly, IT IS ORDERED that the petition for writ of habeas corpus pursuant to 28 U.S.C. Section 2254 is DENIED and the stay of execution issued by this Court on February 11, 1981, is DISSOLVED and the Clerk is directed to ENTER FINAL JUDGMENT.

## EPILOGUE

The murders out of which this case has arisen occurred on August 14, 1977. The petitioner, Martin, was quickly apprehended and was promptly tried, convicted and sentenced within a year. His direct appeal was denied by the Supreme Court of Louisiana in 1979, and the Supreme Court of the United States denied certiorari finally on January 19, 1981. Thereafter the petitioner filed writs of habeas corpus and accompanying applications for stay of execution in the state courts, which applications were denied by the state district court on February 9, 1981, and the Louisiana Supreme Court on February 10, 1981. Petitioner then filed the instant petition in this Court, pursuant to 22 U.S.C. § 2254 on February 11, 1981, two days prior to the scheduled date of his execution, February 13, 1981. This Court, after a hearing at which petitioner and the State were represented by counsel, concluded that it would be physically impossible for the Court to discharge its statutorily mandated duty under 28 U.S.C. § 2254 prior to February 13, 1981, and, accordingly, I was required to grant the petitioner's requested stay of execution in order that the petitioner might have an opportunity to have his petition considered as required by Section 2254.

The convergence of a number of similar stays of execution at about the same time, along with publicity attendant to a statement by the Chief Justice of the United States, caused me to experience a remarkable public outcry. The stay of execution of state prisoners in connection with Section 2254 petitions has generally been perceived as federal judicial tyranny by the public, the press and, indeed, others who should know better, including lawyers and judges. The number of thoughtful letters received from citizens, along with copies of ill-informed editorials from around the country persuades me that public respect for our entire federal judicial process is being endangered. Hence, I believe it appropriate to state a few words, not as an apology for the fashion in which this Court has discharged its duty in this case, but so that thoughtful citizens and editorial writers may, if they wish to attack what they perceive to be a serious flaw in our system, address their complaints to the appropriate forum, the United States Congress, rather than individual United States Judges who have no choice but to attempt to discharge faithfully the statutorily mandated duties imposed by the Congress.

On February 8, 1981, just three days prior to this Court's initial action of granting the stay of execution, the Honorable Warren E. Burger, Chief Justice of the United States Supreme Court, addressed the Mid-Winter meeting of the American Bar Association in Houston, Texas. His candid and extremely perceptive comments concerning flaws in our system of justice were widely reported in the public press, particularly those remarks pertaining to the disrespect for our system of justice brought about by lack of finality in criminal cases. With respect to this problem, the Chief Justice said:

. . . The search for "perfect" justice has led us on a course found nowhere else in the world. A true miscarriage of justice, whether 20-, 30- or 40-years old, should always be open to review, but the judicial process becomes a mockery of justice if it is forever open to appeals and retrials for errors in the arrest, the search, or the trial. Traditional appellate review is the cure for errors, but we have forgotten that simple truth.

Our search for true justice must not be twisted into an endless quest for technical errors unrelated to guilt or innocence.

The system has gone so far that Judge Henry Friendly, in proposing to curb abuses of collateral attack, entitled his article, "Is Innocence Irrelevant?"

And Justice Jackson once reminded us that the Constitution should not be read as a "suicide pact."

Each of these men, of course, echoed what another great jurist, Justice Benjamin Cardozo, wrote more than fifty years ago in his essays on "the nature of the judicial process."

I am not advocating a new idea but merely restating an old one that we have ignored. At this point, judicial discretion and judicial restraint require me to stop and simply to repeat that governments were instituted and exist chiefly to protect people. If governments fail in this basic duty they are not excused, they are not redeemed by showing that they have established the most perfect systems to protect the claims of defendants in criminal cases. A government that fails to protect both the rights of accused persons and also all other people has failed in its mission. I leave it to you whether the balance has been fairly struck.

\*　　\*　　\*　　\*　　.　\*　　\*

Like most United States District Court Judges who daily observe the effect on our system of endless appeals I wholly subscribe to the Chief Justice's observations.

It appears that many individuals and editorial writers, perhaps reading the Chief Justice's remarks out of context, felt that he was being critical of actions by individual judges, rather than commenting upon the net result of the status quo brought about by application of statutorily mandated duties. Surely no thoughtful person could believe that a judge has any option other than to carry out the law as mandated by the Congress. For a judge to do otherwise, regardless of his personal views, would indeed be an act of judicial tyranny.

Thus, I have felt that there needs to be a simple explanation of the constitutional and statutory requirements which bind our United States District Court Judges so that the public may better appreciate the rectitude of actions by judges. I say this not from any viewpoint that judges need to be concerned about their popularity, but rather because of my deep concern about the importance of respect for our system of justice, which is in danger when the public begins to feel that judges act from individual proclivity rather than in furtherance of justice under the law.

In the course of searching for a way to explain in simple fashion the application of federal habeas corpus law to state prisoners I found that other United States District Court Judges were experiencing the same concerns. In particular, Judge William Terrell Hodges of the Middle District of Florida has recently expressed such concerns in an epilogue to an opinion denying a writ of habeas corpus in the case of *Darden v. Wainwright*, 513 F.Supp. 947 (M.D.Fla.) Judge Hodges' opinion so completely expresses my own view that I take the liberty of quoting at length:

The nature of the case, and others like it, has attracted intensive publicity which has, in turn, served to fuel a growing public frustration concerning the administration of criminal justice in the courts. The Chief Justice of the United States in his last annual address to the American Bar Association recognized and gave voice to the same public frustration; and, to the extent that this very real exasperation is fomenting an overall loss of confidence on the part of the public in its court system, particularly the federal courts, those who supply the public with information and opinion should be particularly careful to impart only that information which is accurate in every detail. Unfortunately, many lay persons and even some lawyers and judges do not seem to understand the historical or the contemporary role of the federal courts in habeas corpus proceedings involving state prisoners, and that lack of understanding has caused the public to be the recipient of a considerable quantity of misinformation and erroneous innuendo concerning the proper institution of government upon which responsibility should be placed for both the condition and the cure.

The Constitution of the United States, Article I, Section 9, Clause 2, the so-called non-suspension clause, provides as follows:

"The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

Many seem to believe that this constitutional provision is the direct jurisdictional base of habeas corpus proceedings involving state prisoners. That conclusion is open to substantial doubt. Until 1867, or during the first seventy-eight years of constitutional government, the writ of habeas corpus in the federal courts was governed by the Judiciary Act of 1789 and extended only to prisoners held in custody by the United States, not the several states. Furthermore, even with respect to federal prisoners, the scope or power of the writ was limited to an inquiry as to the jurisdiction of the sentencing tribunal.

In 1867 the availability of the writ of habeas corpus in the federal courts was extended to state prisoners by act of congress now embodied in 28 U.S.C. § 2254. Even then, however, the early cases limited the reach of the writ to an examination of the jurisdiction of the sentencing court. See *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). See also *Schneckloth v. Bustamonte*, 412 U.S. 218, 250, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973) (Powell, J., concurring), and *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Recently, in *Swain v. Pressley*, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977), dealing with the statute creating the Superior Court of the District of Columbia, the Court's decision suggests that the District Courts might well be relieved, with constitutional impunity, of any jurisdiction to issue writs of habeas corpus at the behest of state prisoners so long as state law affords an adequate and effective collateral remedy to test the legality of the petitioner's detention.

In any event, whether the constitution has etched the writ in stone to any degree or not at all is not the point here. It is enough that the existing *statutes*, 28 U.S.C. §§ 2241 and 2254, afford the remedy and thus *require* the District Courts to entertain a state prisoner's application for a writ of habeas corpus if it is claimed that he is detained in custody in violation of the Constitution or laws or treaties of the United States. Moreover, the fact that the state courts have heard and adjudicated the constitutional claim does not generally * preclude the authority and duty of the District Court to make an independent determination of the constitutional issue. Indeed, as a matter of comity to the state courts, the statute requires that all existing state remedies be exhausted *before* the petition is filed in the federal court so that, of necessity, the habeas proceeding is always a rehashing of the constitutional issues already decided in the state courts.

The point of this discussion is that, while there is great clamor for statutory redress of our present law concerning habeas corpus relief, all involved should remember (or should be clearly informed, as the case might be) that the existing law is itself of *statutory* origin. It was not created, and cannot be amended, by the courts. Given the statute it would be a gross violation of law and of a judge's oath of office if he should arbitrarily decline to entertain a proper petition filed under it; and to the extent there is widespread belief that the federal courts have somehow "bootstrapped" their own authority to indiscriminately meddle in state court criminal prosecutions—a belief nurtured by inferences to that effect in the public press—unjustified and unnecessary damage is being done to the very system of judicial administration in which all of us are so vitally interested. Those who wish to debate the need for change should focus their attention and the brunt of their remarks upon the statute and the Congress, not the Courts.

In addition to substantive issues, there is also public concern about the length of time taken by the courts in disposing of habeas corpus proceedings. Quite apart

---

* *Stone v. Powell*, supra, dealing with Fourth Amendment issues, constitutes an exception.

from the notoriously crowded dockets of the federal courts, however, a circumstance which is also beyond the control of the courts, there is no provision in 28 U.S.C. § 2254 requiring expedited consideration whereas there are at least two dozen other statutes which do require that preference be given to specified classes of cases such as, for example, criminal cases governed by the Speedy Trial Act, 18 U.S.C. § 3161.**

Whatever the future may hold for habeas corpus proceedings instituted by state prisoners generally, and whatever the public perspective may be, the case of David Dene Martin has been thoroughly, thoughtfully and quietly considered under the statute and the constitution, and judgment will now be entered as directed. The Petitioner may then seek timely review by the Court of Appeals, as is his right.

## REPORT AND RECOMMENDATION

MARCEL LIVAUDAIS, Jr., Magistrate.

Petitioner, David Dene Martin, is a state prisoner presently incarcerated in the Louisiana State Penitentiary at Angola, Louisiana. On April 10, 1978, petitioner was convicted by a twelve-person jury in the Seventeenth Judicial District Court for the Parish of Lafourche, Louisiana, on four counts of first degree murder in violation of La.R.S. 14:30. In the sentencing stage of his bifurcated trial, the jury unanimously recommended that the petitioner be sentenced to death on each count after finding the existence of two of the necessary aggravating factors listed by the Louisiana Code of Criminal Procedure, Article 905.4: (1) that he knowingly created a risk of death or great bodily harm to more than one person, and (2) that the offense was committed in an especially heinous, atrocious or cruel manner.

The conviction and sentence were affirmed by the Supreme Court of Louisiana.

*State v. Martin,* 376 So.2d 300 (La.1979). An application for rehearing was denied on November 1, 1979. Certiorari was thereafter denied. *Martin v. State of Louisiana,* —— U.S. ——, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980). An application for rehearing was denied on January 19, 1981. *Martin v. State of Louisiana,* —— U.S. ——, 101 S.Ct. 931, 66 L.Ed.2d 847 (1980). Following the United States Supreme Court's refusal to hear petitioner's appeal, petitioner applied for a stay of execution pending an evidentiary hearing on his first post-conviction application for a writ of habeas corpus in the Seventeenth Judicial District Court. (Record Document 12). On February 9, 1981, the state trial judge denied the application. (Record Document 12). Petitioner next applied for the same post-conviction relief in the Supreme Court of Louisiana which denied the application on February 10, 1981. (Record Document 12). Petitioner then filed suit in the United States District Court for the Eastern District of Louisiana seeking a stay of execution and an application for a writ of habeas corpus. On April 1, 1981, it was ordered that an evidentiary hearing be afforded petitioner on the issues of ineffective assistance of counsel raised herein. (Record Document 15). Petitioner has presented the grounds raised herein before the Supreme Court of Louisiana and has therefore, exhausted his state remedies as required under 28 U.S.C. § 2254(b).

Petitioner now seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. He contends that the following grounds entitle him to relief:

1. Petitioner was deprived of his federal constitutional right to the effective assistance of counsel at the guilt-innocence stage of his trial.

2. Petitioner was denied effective assistance of counsel at the sentencing phase of his trial.

** A habeas corpus proceeding under 28 U.S.C. § 2254 is a civil case in the federal court. Examples of other statutes requiring expedited consideration of certain civil cases are 42 U.S.C. § 2000e–5(f)(5), Equal Employment Opportunity Act; 42 U.S.C. § 1971(g), Voting Rights Act; 29 U.S.C. § 1303(e)(4), Employee Retirement Income Security Act; 42 U.S.C. § 504(e), Social Security Act.

3. The trial court committed constitutional error in failing to provide the jury with limiting instructions on the statutory aggravating factors in Article 905.4 of the Louisiana Code of Criminal Procedure, thereby increasing the likelihood of an arbitrary and capricious death verdict case.

4. Petitioner was denied a fair sentencing hearing.

5. The petitioner was deprived of his constitutional rights under the Fourteenth Amendment because there was insufficient evidence for a jury to find beyond a reasonable doubt that the offense was committed in an especially heinous, atrocious or cruel manner within the meaning of Article 905.4(g) of the Louisiana Code of Criminal Procedure.

6. The Supreme Court of Louisiana violated petitioner's constitutional rights under the Eighth and Fourteenth Amendments when it only reviewed the evidentiary sufficiency of one of the two aggravating circumstances found by the jury.

7. The Supreme Court of Louisiana has adopted inconsistent standards of appellate review thereby increasing the likelihood of arbitrary and capricious sentencing in death cases.

8. The Supreme Court of Louisiana erred in reviewing other first degree murder cases only in the district in which the sentence was imposed rather than reviewing first degree murder cases on a statewide basis and in failing to consider other first degree murder cases in which a lesser sentence was actually imposed.

9. The trial court erroneously instructed the jury concerning the mitigating circumstances and the role of such circumstances in determining a death sentence.

10. The Louisiana death penalty statute is unconstitutional under the Eighth and Fourteenth Amendments to the Constitution of the United States.

11. Petitioner was deprived of his constitutional right to effective cross-examination of the witnesses against him, under the Sixth and Fourteenth Amendments to the Constitution of the United States, when he was denied access to the statements of witnesses and their grand jury testimony after they had testified at trial.

12. Petitioner was deprived of his constitutional right to effective cross-examination of the witnesses against him, under the Sixth and Fourteenth Amendments to the Constitution of the United States, when he was denied access to the grand jury testimony and the complete statements of a prosecution witness after inconsistencies between her trial testimony and pre-trial statements had been developed at trial.

13. Petitioner was deprived of his right to due process of law under the Fourteenth Amendment to the Constitution of the United States by the instructions on reasonable doubt at the guilt-innocence stage of the trial.

14. Petitioner was deprived of his constitutional right to a jury representative of a cross-section of the community by the exclusion of prospective jurors for cause solely on the basis of their opposition to capital punishment.

15. The petitioner was deprived of due process of law under the Fourteenth Amendment when his request for a mistrial was denied after a prosecution witness testified about inadmissible and prejudicial hearsay.

16. The petitioner was deprived of his constitutional right to an impartial jury, in violation of the Sixth and Fourteenth Amendments, by excluding for cause jurors who never stated that they were unequivocally opposed to capital punishment.

17. The state of Louisiana has adopted an impermissibly broad and vague

construction of Article 905.4(d) of the Louisiana Code of Criminal Procedure in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

18. There was insufficient evidence at trial to support a finding beyond a reasonable doubt that the petitioner knowingly created a risk of death or great bodily harm within the meaning of Article 905.4(d) of the Louisiana Code of Criminal Procedure.

19. The petitioner was deprived of due process of law when his death sentence was affirmed in part on the basis of a nonstatutory aggravating circumstance.

20. The prosecutor failed to disclose material evidence to the defense at an adequate time prior to trial in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States.

21. The death sentences imposed upon petitioner were disproportionate and excessive under Louisiana law and the Eighth and Fourteenth Amendments to the Constitution of the United States.

The issues raised by petitioner will be categorized for purposes of analysis. Part One will comprise those claims affecting the guilt-innocence stage set forth in grounds 1, 11, 12, 13, 14, 15, 16 and 20. Part Two will comprise those claims affecting the sentencing stage set forth in grounds 2, 3, 4, 5, 6, 7, 8, 9, 10, 17, 18, 19 and 21.

In reviewing a state prisoner's application for a writ of habeas corpus, a federal court is bound by the provisions set forth in 28 U.S.C. § 2254(d) and the standards set forth in *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Consideration must be given to 28 U.S.C. § 2254(d) which provides that in a federal habeas corpus application of a state prisoner, a determination after a hearing on the merits of a factual issue made by a state court of competent jurisdiction and evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless one of the seven specified conditions therein is found to exist or the reviewing federal court concludes that the relevant state court determination is not fairly supported by the record. *Sumner,* supra. If none of the conditions set forth in 28 U.S.C. § 2254(d) are found to exist and the state determination is adequately supported by the record, "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the state court was erroneous." 28 U.S.C. § 2254(d). The Supreme Court of Louisiana made determinations of factual issues which were reduced to writing in a written opinion and, the state district court made factual determinations which were reduced to writing in the transcript of that court's ruling in a hearing on petitioner's application for habeas corpus. Therefore, various allegations in petitioner's application for habeas corpus herein will be considered under *Sumner,* supra, and the provisions enumerated in 28 U.S.C. § 2254.

### PART ONE

■ In ground one petitioner alleges ineffective assistance of counsel at the guilt-innocence phase of his trial. It is established law in this Circuit that a defendant in a criminal proceeding, under the Sixth Amendment, is entitled to representation by an attorney reasonably like to render and rendering reasonably effective assistance. *Nelson v. Estelle,* 642 F.2d 903 (5th Cir. 1981); *Beckham v. Wainwright,* 639 F.2d 262 (5th Cir. 1981); *Beavers v. Balkcom,* 636 F.2d 114 (5th Cir. 1981); *Mays v. Balkcom,* 631 F.2d 48 (5th Cir. 1980); *Hill v. Wainwright,* 617 F.2d 375 (5th Cir. 1980); *United States v. Johnson,* 615 F.2d 1125 (5th Cir. 1980); *Rummel v. Estelle,* 590 F.2d 103 (5th Cir. 1979); *Carbo v. United States,* 581 F.2d 91 (5th Cir. 1978). Additionally, and most important in a review by a federal habeas court, effective assistance of counsel does not mean errorless assistance, nor counsel judged ineffective by *hindsight.* (emphasis supplied) *Nelson,* supra, at 906; *Beckham, supra; Beavers, supra; Kemp v.*

Leggett, 635 F.2d 453 (5th Cir. 1981); *Clark v. Blackburn*, 619 F.2d 431 (5th Cir. 1980); *Easter v. Estelle*, 609 F.2d 756 (5th Cir. 1980); *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), cert. denied 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78; *United States v. Gray*, 565 F.2d 881 (5th Cir. 1978). A federal habeas court must review the actual performance of counsel and determine whether reasonably effective assistance was rendered based upon the totality of the circumstances and the entire record. *Nelson, supra* at 906; *Lovett v. State of Florida*, 627 F.2d 706 (5th Cir. 1980); *U.S. v. Gray, supra*. It must be determined whether there has been a constitutional infraction of petitioner due process rights which would render the trial as a whole "fundamentally unfair." *Cobb v. Wainwright*, 609 F.2d 754 (5th Cir. 1980); *Nero v. Blackburn*, 597 F.2d 991 (5th Cir. 1979). This ground must be rejected.

Petitioner asserts counsel were ineffective in failing to properly investigate the case. Petitioner was represented by Ray Bass of Houston, Texas as lead counsel and James Lightfoot of Houma, Louisiana as local counsel.

The evidence adduced at the federal evidentiary hearing abundantly demonstrates that counsel made a most thorough and adequate investigation in preparation of petitioner's defense. Lead counsel met with petitioner three times prior to trial (TR 11, June 19, 1981) and local counsel met with petitioner numerous times during their investigation. (TR 133, June 10, 1981). Additionally, counsel employed an investigator who worked extensively on the investigation of the case. (TR 12, June 19, 1981; TR 134, June 10, 1981). Counsel also interviewed numerous witnesses and investigated the time sequence relevant in the statements of witnesses to determine if the statements were consistent. (TR 12, June 19, 1981; TR 134, June 10, 1981).

Petitioner asserts that counsel were ineffective in failing to obtain evidence of his drug usage. The theory of the defense was that petitioner did not commit the crime and that he did not make any statements concerning his perpetration of the four murders. Petitioner told counsel he either wanted a complete acquittal or the death penalty. (TR 36, June 19, 1981; TR 82, June 10, 1981). Even so, counsel discussed the possibility of an intoxication defense but decided against such a defense. (TR 15, 16, June 19, 1981; TR 79, 80, 81, 82, June 10, 1981). Lead counsel explained why the defense of diminished capacity was not used:

> "One, I was convinced that the defense of diminished capacity because of drugs was really not a defense that was there. I was not—I mean no one indicated to me any factors that would indicate that at the time of the offense Mr. Martin was intoxicated as a result of drug use. Now, there had been some discussion about the use of drugs. One thing that concerned me in that regard was the incident involving Mr. and Mrs. Martin's child and the birth of their child. There had been a child that was born to Mr. and Mrs. Martin with some very serious complications. One of the complications being some brain damage. It appeared that those complications may very well have been related to drug use on the part of either Mr. Martin or Mrs. Martin.
>
> And I was concerned that a jury in a death penalty case, where there had been some allegations and some evidence offered that Mr. Martin had been responsible for the death of four people, any suggestion that he might have, either inadvertently or through negligence or engaging himself in unlawful activities such as the use of drugs, had been responsible for the serious complications to his child, may have seriously prejudiced Mr. Martin in the eyes of the jury. It was a tactical decision, but I saw no benefit to be gained, and certainly saw some very down-side aspects to the whole situation.

> \* \* \* \* \* \*

> The theory was that someone other than Mr. Martin had committed the crimes, that the four people who were shot had actually been shot somewhere else and placed in the trailer. And the physical

evidence was developed in this regard. Personally, I was convinced that the physical evidence made a fairly strong showing that these people could not have been shot in that small trailer. And that was the theory of the defense of Mr. Martin." (TR. 16, 17, June 19, 1981).

Petitioner next contends that counsel were ineffective in their failure to file a motion for a change of venue. The evidence clearly shows that counsel thoroughly discussed the possibility of filing a change of venue motion but decided against filing such a motion. (TR 73, 74, 75, June 10, 1981; TR 21, 22, June 19, 1981). This was clearly a "tactical decision" (TR 21, June 19, 1981) of counsel which was thoroughly considered and cannot rise to the level of ineffective assistance.

Petitioner contends that counsel were ineffective in failing to obtain an adequate psychiatric evaluation of himself to explore a possible defense of not guilty by reason of insanity. The record reveals that counsel had petitioner evaluated by a psychiatrist and that counsel discussed the possibility of an insanity defense but decided against using it. (TR 77, 78, June 10, 1981; TR 20, 21, June 19, 1981). Lead counsel stated:

"Mr. Martin was not agreeable to a defense of insanity, and by that I mean that Mr. Martin, one, did not appear to be insane, two, Dr. Byrd was not of the opinion that Martin was insane, and three, Mr. Martin was opposed to an insanity defense. He did not want an insanity defense to be raised." (TR 20, 21, June 19, 1981).

Petitioner alleges that counsel were ineffective in failing "to engage in the systematic, exhaustive pre-trial motion practice which is indispensable to the effective defense of capital cases." A review of the state record reveals that counsel filed extensive pre-trial motions in defense of petitioner. (Vol. 1, State TR. 28–39, 54, 56). Petitioner does not complain of the omission of any particular motion which could have been beneficial to him but only states that counsel were ineffective in failing to follow an "exhaustive pre-trial motion practice."

The state court record together with the evidence adduced at the federal evidentiary clearly establishes that this allegation is without foundation.

Finally, petitioner contends that counsel were ineffective in failing to object to improper closing argument by the prosecution. Petitioner makes only the conclusory allegation and does not refer to any specific portions of the closing argument which were allegedly improper. The closing argument of the state at the guilt-innocence stage of trial has been reviewed (Vol. 10, State TR. 1499–1502, 1532–1540) and error, if any, of counsel in failing to object to the alleged improper closing argument did not render the trial as a whole fundamentally unfair. This allegation should be rejected.

In addressing the ineffective assistance of counsel grounds alleged petitioner's application for post-conviction relief, the presiding trial judge stated in his ruling denying such relief:

"In this particular case I was the trial judge from start to finish and I observed the manner in which counsel performed throughout the preliminary stages, the trial, and the appeal. The defendant was represented by two persons whom in my opinion are very competent counsel: Mr. Ray Bass and Mr. James Lightfoot. I might further add that Mr. Lightfoot's wife, Mrs. Lynn Lightfoot, also assisted at some stages of the proceedings. It was my impression of the Defense that it tried vigorously to protect the rights of the defendant and to secure his acquittal of the charges. I feel that the defense counsel in this case did an admirable job in defending a case that was extremely difficult. Based on my experience in trying criminal cases and having presided in this case from start to finish, I certainly cannot say that based on the face of this record or the claims made by the defendant that the Defense was inadequate. The mere fact that the result is not to the defendant's liking does not establish this claim." (State TR App. Post Conviction Relief 2, February 9, 1981).

In grounds eleven and twelve petitioner contends that he was denied his Sixth Amendment rights under the Confrontation Clause because the state's denial of access to the testimony of state witnesses prior to trial denied him the right to effective cross-examination of these witnesses. These grounds should be rejected.

The Confrontation Clause does not provide the defendant with any right to pre-trial or in-trial discovery of the state's evidence. The purpose of the Confrontation Clause is to provide the defendant with the opportunity to challenge the testimony introduced by the state against the accused at trial by means of cross-examination of the declarant of the testimony. *See Ohio v. Roberts*, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597 (1980). Where the declarant whose testimony the state wishes to introduce is present at trial, gives his sworn testimony at trial, and is subject to cross-examination by the defense as happened at the petitioner's trial, the Confrontation Clause is satisfied. *See id.* at 65, 100 S.Ct. at 2538. The petitioner has not cited, and this court has not discovered anything in the English or American history of the Confrontation Clause, or in any decision of the Supreme Court interpreting that clause, which suggests in the slightest that the Confrontation Clause is in any way concerned with discovery. *See generally Ohio v. Roberts, supra,* and authorities cited therein. Accepting the petitioner's argument would transform the Confrontation Clause from a device designed to prevent trial by affidavit into a guarantee of the right to demand trial by affidavit. In addition, petitioner's argument would require this Court to hold the Jencks Act, 18 U.S.C. § 3500, unconstitutional because it permits the government to withhold witness statements to the defense until after they have testified. In short, any right to discovery guaranteed by the federal constitution must find its source in cases such as *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) rather than the Confrontation Clause.

In ground thirteen petitioner argues that he was deprived of his right to due process of law under the Fourteenth Amendment by the instruction on reasonable doubt at the guilt-innocence stage of the trial. Initially, it should be noted that defense counsel raised no objection to the jury charge on reasonable doubt at trial. Nowhere in his petition does petitioner allege specific reasons as grounds for this claim, only the conclusory allegation is set forth. This ground should be rejected.

Before a federal court may grant relief under 28 U.S.C. § 2254 based on an alleged error in a state trial court's unobjected-to charge, the error must be so egregious as to rise to the level of a Constitutional violation or so prejudicial as to render the trial itself fundamentally unfair. *Bryan v. Wainwright*, 588 F.2d 1108 (5th Cir. 1979); *Bradley v. Wainwright*, 561 F.2d 1200 (5th Cir. 1977).

In reviewing the adequacy of a jury instruction, a federal habeas court must not examine the instruction in isolation from the entire charge but must examine a challenged instruction in light of the charge as a whole. *Henderson v. Kibbe*, 431 U.S. 145, 152 n.10, 97 S.Ct. 1730, 1736 n.10, 52 L.Ed.2d 203 (1977); *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–401, 38 L.Ed.2d 368 (1973); *Stephens v. Zant*, 631 F.2d 397, 405 (5th Cir. 1980), *modified*, 648 F.2d 446 (1981).

Upon reviewing the charge as a whole, (Vol. 10, State TR. 1541–69, 1571–73), it is clear that no constitutional violation occurred by the instruction on reasonable doubt at the guilt-innocence stage of the trial. The charges given by the trial court were adequate and proper. There was no error.

In ground fourteen petitioner has argued that the exclusion for cause of veniremen at the guilt stage of his trial who were irrevocably opposed to capital punishment denied him the right to a jury representative of the community in violation of the Sixth and Fourteenth Amendments. This ground should be rejected.

The Fifth Circuit rejected this argument in *Spinkellink v. Wainwright*, 578 F.2d 582 (1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). The *Spinkellink* court recognized that the Supreme Court held in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) that the Sixth and Fourteenth Amendment right to a jury trial included the right to a jury venire drawn from a representative cross-section of the community. *Id.* at 597. But, as the Supreme Court unanimously held in *Lockett v. Ohio*, 438 U.S. 586, 596–97, 98 S.Ct. 2954, 2960–61, 57 L.Ed.2d 973 (1978), the Sixth and Fourteenth Amendment right to a representative jury does not include the right to be tried by jurors who are unable or unwilling to follow the law and instructions of the trial judge and act as impartial jurors at the guilt stage of a capital case. The state as well as the defendant has legitimate and vital interests at stake at both the guilt and penalty stages of a capital case. The Supreme Court reaffirmed this balance in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and summarized the Court's cases discussing this principle:

"This line of cases established the general proposition that a juror may not be challenged for cause based upon his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath. The State may insist however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."

In *Spinkellink*, the court held that the state was entitled to conclude that veniremen who are irrevocably opposed to capital punishment would engage in jury nullification if permitted to sit at the guilt but not the penalty stage of a capital case and so would not be impartial fact finders, in much the same fashion as would relatives of the defendant acting as jurors. *Spinkellink v. Wainwright, supra*, 578 F.2d at 597. Because this rationale provides a sufficient ground for excluding such jurors, a defendant's Sixth and Fourteenth Amendment

rights would not be violated by the practice challenged by petitioner.

In ground fifteen petitioner contends that he was deprived of his right of due process of law by the trial court's denial of his request for a mistrial after a police officer testified to hearsay. This ground should be rejected.

A review of the record reveals that certain clothing found at petitioner's residence was admitted into evidence. At trial, a police officer testified before the jury concerning the acquisition of the clothing:

"The blue jean shirt was received by Detective Boudreaux from the wife of Mr. Martin, and the trousers came from a bathroom at that residence that Mrs. Martin identified as belonging to her husband." (Vol. 8, State TR 1257).

Petitioner objected and requested the judge to instruct the jury to disregard the comment. The trial judge complied with the request. (Vol. 8 State TR 1257). Subsequently, another police officer testified:

"This is a shirt we picked up out of the house which Gloria Martin gave to Detective Lirette and said it belonged to David Martin." (Vol. 9, State TR 1296, 1297).

Petitioner again objected and the trial judge again complied with his request for an admonition. (Vol. 9, State TR 1297). He then requested a mistrial arguing that such hearsay was so prejudicial that an admonition to the jury was insufficient to cure it. (Vol. 9, State TR 1298). The trial judge denied the request. (Vol. 9, State TR 1298). On petitioner's direct appeal, the Louisiana Supreme Court examined the entire record and concluded that the hearsay statement was not so prejudicial that a mistrial should have been granted and did not result in a miscarriage of justice. *State v. Martin, supra*, 376 So.2d at 308.

The Louisiana Supreme Court stated in its opinion on petitioner's direct appeal:

"Examining the record as a whole, the hearsay statement does not appear so prejudicial that a mistrial should have been declared. The State apparently introduced the shirt at trial because the

spot of blood was arguably inculpatory since it may have been from one of the victims. However, the victim's blood types were never introduced at trial and the only evidence of blood at the murder scene indicated type O blood. Moreover, the defendant offered evidence that his own blood type was type A, the same as the blood on the work shirt. There did not appear to be a serious dispute that the shirt did not belong to defendant since defendant's wife located the shirt for the police. Although the police officer should not have testified to hearsay, this error probably did not result in a miscarriage of justice, prejudice to the substantial rights of the accused or constitute a substantial violation of a constitutional or statutory right. LSA–C.Cr.P. art. 921." *Id.* at 308.

For purposes of review by a federal habeas court it must be determined whether there has been a constitutional infraction of petitioner's due process rights which rendered the trial as a whole "fundamentally unfair." *Nelson v. Estelle*, 642 F.2d 903, 906 (5th Cir. 1981); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Cobb v. Wainwright*, 609 F.2d 754 (5th Cir. 1980).

Petitioner contends that a constitutional violation occurred when the trial court denied his request for a mistrial after having admonished the jury that it was not to consider the hearsay statement of the police officer. (see Vol. 9, State TR 1297–98). After a careful and thorough review of the state record, it is evident that petitioner's proposition cannot withstand the applicable standards required for habeas corpus relief. The admonition to the jury at trial was adequate as the hearsay was not so prejudicial that the admonition was insufficient to cure it. Consequently, any claim that petitioner's trial was rendered "fundamentally unfair" by the trial court's denial of his request for a mistrial after a police officer testified to hearsay which was not admitted into evidence lacks validity.

In ground sixteen petitioner has argued that the exclusion for cause from the guilt stage of his trial of those veniremen who would have been impartial factfinders at that stage but who would have automatically voted not to impose the death penalty violated his right under the Sixth and Fourteenth Amendments to a trial by an impartial jury. This selection process resulted in the selection of a jury that was "death-qualified" and "prosecution-prone" with respect to the question of his guilt or innocence. Therefore, according to the petitioner, the jury that convicted him was biased in favor of the prosecution and so deprived him of his right to trial by an impartial jury. This ground must be rejected for several reasons.

The Fifth Circuit rejected this argument in *Spinkellink v. Wainwright, supra,* 578 F.2d 582 (1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). The *Spinkellink* court both noted that the proposition that a jury composed in such a manner would be more likely to convict than a jury which included persons irrevocably opposed to capital punishment had been rejected by the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 518, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968) on the basis of the evidence available at that time, and also recognized that the proof of proposition in question developed since the *Witherspoon* decision still remained "far from conclusive." *Spinkellink v. Wainwright, supra,* 578 F.2d at 593–94 (footnote omitted). But, assuming that proposition to be true, the court rejected the conclusion to be drawn from that proposition advanced by the petitioner there, and here, that the greater likelihood of a "death-qualified" jury to convict rendered such a jury partial towards the prosecution. The *Spinkellink* court concluded that neither the exclusion of persons irrevocably opposed to capital punishment nor the inclusion of persons without such personal attitudes denied a defendant in a capital case the right of an impartial jury on the question of his guilt or innocence. *Spinkellink v. Wainwright, supra,* 578 F.2d at 593–96.

The *Spinkellink* court based its decision on three propositions regarding the require-

ment that a jury in a criminal case be impartial. First, the state as well as the accused is entitled to an impartial jury. Second, the numerical difference between the number of guilty verdicts rendered by "death-qualified" and "non-death qualified" juries, by itself, did not demonstrate a difference between the two groups regarding their impartiality merely because of the numerical difference between the results achieved under the jury selection systems. And third, the state was entitled to conclude that persons irrevocably opposed to capital punishment would engage in jury nullification if seated at the guilt stage of a capital case but not at the penalty phase. The first proposition, according to the *Spinkellink* court, flowed from the requirement that a jury in a criminal case be *im partial*, the second from the nature of the impartiality required of criminal juries, and the third, from the presence of jury nullification.

Accordingly, the *Spinkellink* court concluded that the jury selection process challenged by the petitioner in that case and here did not violate his right to an impartial jury.

 In ground twenty petitioner contends that the prosecution failed to disclose evidence of blood tests of the victims at an adequate time prior to the trial in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States. The record reveals that the victim's blood types were not discovered until after the trial, at which time, the evidence was disclosed and the trial judge thereafter denied petitioner's motion for a new trial. This ground should be rejected.

Petitioner filed a motion for pre-trial discovery requesting specifically the results of any scientific tests or experiments conducted upon the bodies of the victims. Additionally, a pre-trial motion for discovery and inspection of evidence favorable to the petitioner on the issue of guilt or innocence was filed.

Petitioner's allegation that the prosecution's failure to disclose evidence of blood tests of the victims violated his due process

rights must be viewed under the right of discovery of exculpatory evidence as established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The United States Supreme Court held in *Brady, supra*, at 87, 83 S.Ct. at 1196, that suppression by the prosecutor of evidence favorable to an accused when the accused has specifically requested the evidence violates due process "where the evidence is material either to guilt or punishment." The United States Fifth Circuit Court of Appeals has held that a defendant seeking to establish a *Brady* violation must prove the following: (1) the prosecution's suppression of the evidence; (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence. *Ogle v. Estelle*, 641 F.2d 1122, 1124 (5th Cir. 1981); *Monroe v. Blackburn*, 607 F.2d 148, 150 (5th Cir. 1979); *cert. denied*, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980), quoting *United States v. Sink*, 586 F.2d 1041, 1051 (5th Cir. 1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Anderson*, 574 F.2d 1347, 1353 (5th Cir. 1978).

The standard of materiality under *Brady* where the prosecutor has not disclosed information despite a specific defense request is whether "the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). The Louisiana Supreme Court, in a written opinion, determined that the "discovery of the victim's blood types was not so material that it would have produced a different result than the verdict reached." *State v. Martin*, supra at 309. Clearly, the Louisiana Supreme Court made a factual determination on the materiality of this newly discovered evidence and such determination is entitled to a presumption of correctness under *Sumner* and 28 U.S.C. § 2254 where none of the specified conditions therein exist.

On petitioner's direct appeal the Louisiana Supreme Court stated:

"In the instant case discovery of the victim's blood types was not so material that

it would have produced a different result than the verdict reached. The presence of blood all over the trailer, including the walls, weakened the defendant's theory that the bodies were moved. Additionally, no other drops of blood were found in a direct line between the victim having type O blood and the kitchen counter, nor were any drops of blood found outside or leading into the trailer. The amount of blood in the trailer as well as the fact that no clotting occurred further supported the theory that the murders occurred in the trailer." *State v. Martin, supra,* at 309.

█ In order to establish a *Brady* claim petitioner must show that the prosecution suppressed material, exculpatory evidence, 373 U.S. at 87, 83 S.Ct. at 1196. Even assuming the evidence here was technically "suppressed," there was no *Brady* violation. The blood test results obtained and diagnosed by the prosecution after trial, were neither exculpatory nor material to petitioner's defense. *United States v. Agus, supra,* 427 U.S. at 112–113, 96 S.Ct. at 2401–2402. See *State v. Martin, supra* at 309.

This court has thoroughly analyzed the record and has found no support for the petitioner's contention that he was denied his due process rights under the Fourteenth Amendment to the Constitution of the United States. This allegation is without merit.

## PART TWO

█ In ground two petitioner contends that his counsel were ineffective at the sentencing phase of his trial. Applicable law in this regard has been set forth earlier herein in that portion discussing effectiveness of counsel at the guilt-innocence phase of the trial, petitioner's first ground. This ground should, likewise, be rejected.

Prior to commencement of the sentencing hearing, petitioner's counsel moved the court unsuccessfully to exclude from consideration either by the jury or the court the imposition of death as a punishment for numerous reasons presented to the court in oral argument. (Vol. 10, State TR 1577,

1578, 1579). The state made an opening statement and thereafter the defense chose not to make an opening statement. (Vol. 10, State TR 1594). The state then rested its case after filing into evidence for the jury's consideration the entire record of the trial proceedings.

Petitioner's counsel then first called a friend of petitioner's, a local auto body and paint worker, who testified in detail regarding petitioner's church activities, good character, generosity, counselling of youths at a drug clinic and the effect on petitioner of the birth of his child with brain damage. (Vol. 10, State TR 1595–1605). Petitioner's brother, a data processing manager, was then called and testified to petitioner's background, generosity, lack of a prior criminal record, and the effect on petitioner of the birth of his child with brain damage. (Vol. 10, State TR 1605–1608). Finally, petitioner's counsel called a local bank branch manager who testified to petitioner's good character, his involvement in youth programs, and his generosity. (Vol. 10, State TR 1609–1611). Counsel then made a very detailed and adequate closing argument to the jury. (Vol. 10, State TR 1614–1616).

Upon reviewing the actual performance of counsel at the sentencing hearing and the testimony adduced at the federal habeas evidentiary hearing, it is evident that petitioner received reasonably effective assistance of counsel, the standard required under the Sixth Amendment. It cannot be said that counsel for petitioner rendered ineffective assistance at the sentencing hearing because he did not call certain witnesses who were called by petitioner at the federal habeas evidentiary hearing. Much of this testimony would have been cumulative at the sentencing hearing, and furthermore, the omission of certain testimony at the sentencing hearing which was adduced at the federal habeas evidentiary hearing did not render the sentencing hearing "fundamentally unfair" thereby creating a constitutional infraction of petitioner's due process rights.

Upon carefully reviewing the state record and having afforded petitioner the opportu-

nity to meet his burden of proving that he did not receive effective assistance of counsel at the sentencing phase of his trial, it is evident that petitioner did in fact receive that reasonably effective assistance of counsel to which he is constitutionally entitled and his argument to the contrary should be rejected. That which counsel *might* have done which *might* have caused the verdict to be different is purely and simply unwarranted speculation by hindsight. Authorities cited on pages 690 and 692 of this report.

It is noteworthy that these character witnesses who testified at the federal habeas evidentiary hearing were not in the vicinity of the crime or the defendant's residence either at the time of the crime or the time of the trial. There was no evidence in the record to suggest that defendant told his attorney about these witnesses and their testimony was cumulative to that which was in fact presented at the sentencing stage of the trial. Hindsight facilitates the discovery of new witnesses but, as aforesaid, they would have produced no new evidence.

Petitioner's suggestion that a diminished capacity theory could have been used at the sentencing hearing, despite the trial theory that someone other than petitioner had committed the crimes, would invite the jury to question the credibility of the sentencing witnesses. This is another suggestion of something that *might* have been done which *might* have changed the outcome, but certainly not suggestive of ineffectiveness.

The suggestion that a psychiatrist *might* have been called to testify concerning the effects on behavior of phencyclidine (PCP) has its pitfalls. There was no evidence at the trial that petitioner had in fact taken PCP, thus the only way to get this evidence in, if it existed, was to put petitioner on the witness stand. This poses problems. Petitioner would be subjected to cross-examination. The inconsistency with the trial theory would again arise and be exacerbated with petitioner on the stand. Important too is the fact that the jury is not required to consider PCP intoxication a mitigating factor. *Lockett v. Ohio, supra,* does not require the jury to consider evidence produced by the defense as mitigating. *Lockett* only requires that the defendant be permitted to introduce relevant mitigating evidence in his view and the jury not be prevented by state law from considering relevant mitigating evidence as the basis for imposing a sentence less than capital punishment.

■ In ground three petitioner contends that the trial court committed constitutional error in failing to instruct the jury with limiting instructions on the statutory aggravating factors in Article 905.4 of the Louisiana Code of Criminal Procedure regarding the aggravating factors jury must consider in deciding whether to impose a death sentence. This argument should be rejected.

■ In reviewing the adequacy of a jury instruction, a federal habeas court must not examine the instruction in isolation from the entire charge but must examine a challenged instruction in light of the charge as a whole. *Henderson v. Kibbe,* 431 U.S. 145, 152 & n.10, 97 S.Ct. 1730, 1735 & n.10, 52 L.Ed.2d 203 (1977); *Stephens v. Zant,* 631 F.2d 397, 405 (5th Cir. 1980), *modified,* 648 F.2d 446 (1981). The Supreme Court stated the rationale for this procedure in *Cupp v. Naughten, supra,* 414 U.S. at 146–47, 94 S.Ct. at 400 (citations omitted):

"In determining the effect of this instruction on the validity of respondent's [state] conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge .... While this does not mean that an instruction by itself may never rise to the level of constitutional error, ..., it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such

instructions but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."

*Henderson v. Kibbe,* supra, 431 U.S. at 152 n.10, 97 S.Ct. at 1736 n.10 (quoting *Cupp,* 414 U.S. at 146–47, 94 S.Ct. at 400.) A federal habeas petitioner has a tough burden to overcome in demonstrating that he is entitled to relief on the ground that a jury instruction or jury instructions violated his rights under the federal constitution.

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," ... not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned.'"

*Henderson v. Kibbe,* supra, 431 U.S. at 154, 97 S.Ct. at 1736–37 (citations and footnote omitted). Where the petitioner challenges the jury instructions on the ground that a particular instruction or instructions were omitted his "burden is especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155, 97 S.Ct. at 1737. These same principles are applicable when a petitioner contests the validity of the jury instructions at the penalty stage of a capital case. *Stephens v. Zant,* supra, 631 F.2d at 405.

Upon reviewing the charge as a whole, (Vol. 10, State TR 1617–21), it is clear that no constitutional error occurred in the failure of the trial court to provide the jury with limiting instructions. The charges given by the trial court were furnished to defense counsel prior to the sentencing hearing, (Vol. 10, State TR 1621), and the defense made no objection to these charges.

The jury instructions followed the wording of the statute and required the jury to find the aggravating circumstances, set out in the statute. There was no error.

In ground four of his petition, the petitioner claims that he was deprived of his right to a fair sentencing hearing because relevant mitigating evidence regarding his mental and emotional state prior to and at the time of the murders was not presented at the penalty phase of his case. This ground should be rejected for several reasons.

First, the opinion of the Louisiana Supreme Court demonstrates quite clearly that there was evidence presented regarding the factors the petitioner claims should have been presented in mitigation of his crimes. *See State v. Martin, supra,* 376 So.2d at 302–03 (marital problems and alcohol consumption on night of murders); *id.* at 313 (prior community involvement, lack of history of prior criminal activity, youth, emotional problems stemming from, for instance, child born with brain damage and infidelity by spouse); *id.* at 314 (Calogero, Jr., concurring in part and dissenting in part); *id.* at 314, 315 (Dennis, J., concurring in part and dissenting in part). Therefore, the petitioner's claim is simply that other and additional evidence should have been introduced. However, the petitioner's failure to introduce other such evidence does not amount to a constitutional claim that the statute under which he was sentenced or the procedure by which the jury imposed its sentence violated any decision by the Supreme Court regarding the constitutionality of a state's capital sentencing procedure. The right to introduce relevant mitigating evidence at the sentencing stage of his trial provided by the Supreme Court's decision in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) does not require the trial judge to scout around for the defendant to uncover such evidence or demand that the defendant introduce any and all such evidence he can imagine. See *People v. Jackson,* 28 Cal.3d 264, 618 P.2d 149, 174–75, 168 Cal.Rptr. 603, 628–29 (1980). *Cf. Wainwright v. Sykes,* 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977) (defendant's right to a hearing on the

voluntariness of his confession provided by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) does not require the trial judge to hold such a hearing absent a defense objection to the admission of the confession).

Second, a mentally competent defendant may validly waive his constitutional challenges to a potentially illegal sentence that has already been imposed, *see Lenhard v. Wolff*, 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979) (mem.); *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), and may also represent himself at trial and decline to introduce any mitigating evidence at all. *Id.; Bishop v. State*, Nev., 597 P.2d 273 (1979). *Cf. Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (state defendant has a federal constitutional right to represent himself at trial). Therefore, if a defendant in a capital case can forego his challenges to a potentially unconstitutional sentence and can forego his right to introduce mitigating evidence by declining to introduce any such evidence, a defendant's failure to introduce certain particular mitigating evidence which, in addition, in this case would have been cumulative is hardly unconstitutional.

Third, even if the petitioner's claim is viewed as presenting a claim of newly discovered evidence, which it quite demonstrably is not, his argument would fail because the petitioner, who bears the burden of proof in a federal habeas corpus proceeding, *Bouchillon v. Estelle*, 628 F.2d 926, 928 (5th Cir. 1980), can not demonstrate any of the requirements to establish this claim, *see United States v. Zicree*, 605 F.2d 1381, 1390 (5th Cir. 1979), that the absence of this evidence rendered his penalty hearing "fundamentally unfair," *cf. Nelson v. Estelle*, 642 F.2d 903, 907 (5th Cir. 1981), or that this evidence undermines the evidentiary support for the jury's verdict. *Cf. Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Fourth, accepting the petitioner's argument would permit a defendant or his counsel to interpose defense "sandbagging" as a federal constitutional barrier to a lawful state sentence by permitting a defendant or his attorney to withhold evidence from the penalty hearing as a means of changing that proceeding from "the 'main event'" into "a 'tryout on the road' for what will later be the determinative federal habeas hearing." *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). A defendant or his attorney could, under the petitioner's argument, decline to introduce certain mitigating evidence in order to be able later to challenge the validity of the defendant's death sentence should one be returned on the ground that the sentencing agency did not have all the relevant mitigating evidence before it when it imposed the defendant's sentence. The possibilities for sandbagging are monumental. A defendant could withhold cumulative evidence as his ace in the hole should the jury or judge return a capital sentence, and should the jury fail to return a death sentence, the defendant would have lost nothing. Just as a defendant's right under *Lockett* to introduce what he views as mitigating evidence does not entail any corresponding right to have the jury accept that evidence as sufficient to mitigate the heinousness of his crime or background, that right does not permit a defendant to demand that the sentencing process be continually repeated until he finds a jury willing to impose a sentence less than death.

Finally, the absence of evidence concerning the defendant's intoxication from drugs or alcohol at the time of the murders is quite understandable. Such evidence cuts for and against a defendant. While some juries may consider intoxication to be a mitigating factor, some others may not and may consider it to be of no mitigating value at all. And in this case, the jury may have even concluded that such evidence undermined the credibility of the defense because the defense proceeded at trial, as desired by the defendant, under a theory that someone other than the defendant was responsible for the murders. Introducing evidence of intoxication at the penalty stage then would have been inconsistent with the theory presented by the defense at the guilt stage. Under such circumstances, the jury

would have been entitled to discredit the mitigating value of contradictory defense testimony. Therefore, the absence of direct evidence of intoxication in this case is entirely reasonable in light of the path chosen by the defendant-petitioner and followed by the defense at trial.

In grounds five and eighteen petitioner argues, respectively, that he was deprived of his right to due process of law because there was insufficient evidence at trial to support a finding within the meaning of Article 905.4(d), (g) of the Louisiana Code of Criminal Procedure that the offense was committed in an especially heinous, atrocious, or cruel manner and that the petitioner knowingly created a risk of death or great bodily harm to more than one person. These grounds must be rejected.

The Supreme Court in *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, held that a defendant in a criminal case is protected under the Due Process Clause of the Fourteenth Amendment against a conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.*, at 364, 90 S.Ct. at 1073. This standard was expanded in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in that a federal habeas court must grant habeas corpus relief if it is found that upon the evidence adduced at trial no rational trier of fact could have found proof of guilty beyond a reasonable doubt. However, it is not clear that the standard applicable in reviewing a sentence of a jury in a bifurcated trial, after the defendant has been found guilty, is that same "proof of guilt beyond a reasonable doubt" standard applicable at the guilt-innocence stage. The Supreme Court stated:

> "While the various factors to be considered by the sentencing authorities do not have numerical weight assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt v. Florida*, 428 U.S. 242, at 258, 96 S.Ct. 2960, at 2969, 49 L.Ed.2d 913 (1976).

Assuming this federal habeas court is controlled by the standard that relief is not to be granted unless no rational trier of fact could have found proof of the aggravating circumstances beyond a reasonable doubt at the sentencing stage of trial, petitioner's sentence is not unconstitutional as there was sufficient evidence adduced at trial to uphold his sentence under constitutional standards. In applying the standard for habeas review enunciated in *Jackson*, state law defining the elements of criminal offense must be looked to as the basis for applying the *Winship* standard. *Jackson v. Virginia, supra*, at 316, 99 S.Ct. at 2788 (note 7). In *Jackson*, the United States Supreme Court stated:

> "After *Winship* the critical inquiry or review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.... Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to

guarantee the fundamental protection of due process of law." *Jackson v. Virginia, supra,* 443 U.S. at 318–19, 99 S.Ct. at 2789–90 . . . (footnote and citations omitted).

Additionally, the Supreme Court stated: "Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. . . . We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in *Winship,* a federal habeas corpus court faced with a record of historical facts that supports conflicting inference must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.,* at 326, 99 S.Ct. at 2793. (citations omitted).

The Louisiana Supreme Court has determined that the term "heinous" includes the torture or pitiless infliction of unnecessary physical or psychological pain on the victim. *State v. Sonnier,* 379 So.2d 1336, 1361 (La. 1979). Additionally, that court held that "[w]here an offender kills two or more persons during a *single consecutive course of conduct* for the purpose of preventing any one of those killed from disclosing the murder of the other, or others, then the offender's conduct is within the contemplated statutory meaning" of Article 905 of the Louisiana Code of Criminal Procedure. *Id.* at 1362.

On petitioner's direct appeal, the Louisiana Supreme Court found:

"[He] parked his car down from the place so that he would look like a hitchhiker. He went to the trailer, knocked and asked if he could speak to Bobby. One of the victims allowed the defendant to enter the trailer. Todd walked into the room toward the defendant. As he did Martin pulled the .357 Magnum from under his shirt. Todd offered the defendant two rolls of money which he produced from his pocket believing the defendant to be a robber. Martin responded that he did not want Todd's money, he just wanted Todd to know his name. Then he shot Todd twice in the chest. Martin then proceeded to shoot the other three persons who were also in the trailer: Terry Hebert, Anne Tierney and Sandra Brake.

The evidence regarding the exact sequence of events after Todd was shot is sketchy. The defendant told Pamela Wilson that he shot Terry Hebert next and then the two women. The autopsies revealed that Terry Hebert had been shot five times in the back and side, two shots having pierced his heart; Sandra Brake was shot twice in the heart and had defensive wounds on her wrist and arm; Anne Tierney was shot six times, once in the chest, four times in the abdomen and once in the face. The defendant related to Chester Golden that he had shot one of the girls in the stomach and that she would not die. He said she told him she was hurting and begged him to kill her, to finish her, so he shot her in the head and finished her.

There were a total of at least fifteen shots fired. Since defendant was carrying a six-round revolver, he was required to stop and reload twice during the shooting. After the shooting, the defendant took the rolls of money to make it look like a robbery. He threw the pistol and the money in a nearby bayou." *State v. Martin, supra,* at 303.

Additionally, the Supreme Court noted:

"The evidence established that the defendant lay in wait for Bobby Todd on the two nights prior to the murder. He told Chester Golden that he was having difficulty catching Todd alone because people were always with him, particularly Terry Hebert. The defendant told Raymond Rushing on the day before the murders that he (Martin) was going to shoot Todd. The evidence clearly established that when Martin went to Todd's trailer on Sunday evening, he did so with the intent to shoot Todd. While he told

Pamela Wilson that at first he thought Todd was alone, he must have known that Todd was not alone when someone else answered the door and allowed him to enter the trailer. Nevertheless, defendant elected to pursue his plan to kill Todd.

We think the evidence is sufficient to support the conclusion that the defendant murdered the victims one after the other as a part of a single consecutive course of conduct in order to prevent any of the victims from reporting to the police the murder of the others.... Martin told Golden, when asked why he killed the women, that "once I started shooting, there was no stopping." Golden gave this account of defendant's response to his (Golden's) inquiry about how Martin thought he could get away with the murders:

"He said, 'I didn't touch anything.' He said, 'No one saw me.' He said, 'I'll just stick to my story, keep my mouth shut, and I'll get off.' I said, 'David, everybody knows you had a grudge against Bobby Todd.' He said, 'I figure they will pick me up, but I'm just going to keep my mouth shut.' He said, 'They just don't have any proof.'"

*Id.* at 312.

The Louisiana Supreme Court also stated that "[t]he evidence showed he lay in wait to kill Todd for two successive evenings before finally getting him on the third night" and "Martin killed three people to prevent them from being able to disclose that he was Todd's killer. *State v. Martin,* at 313 (footnote omitted). These factual determinations of the Louisiana Supreme Court are entitled to a presumption of correctness. 28 U.S.C. § 2254(d); *Sumner v. Mata, supra.*

In considering the aggravating circumstances found by the jury in this case, it is clear that the circumstance of "creating a risk of death or great bodily harm to more than one person" was met under the standards enunciated in *Jackson,* in the murder of Anne Tierney. Additionally, the aggravating circumstance of the offense having been "committed in an especially heinous,

atrocious, or cruel manner" was properly determined in the murder of Anne Tierney. After carefully reviewing the evidence adduced at the trial, it is evident that a rational trier of fact could have found proof of these two aggravating circumstances beyond a reasonable doubt in the death sentence handed down for the murder of Anne Tierney. This constitutionally valid death sentence for the first degree murder of this young woman is sufficient to reject petitioner's proposition, as a review of the remaining three death sentences is unnecessary. The jury was clearly instructed that it was to consider each verdict separately. (Vol. 10, State TR 1617–18).

In *Stromberg v. California,* 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931), the Supreme Court held that if a jury was instructed to consider several grounds for conviction, one of which proves to be unconstitutional, and the reviewing court is thereafter unable to determine from the record whether the jury relied on the constitutional ground, the verdict must be set aside. Additionally, where one aggravating circumstance is invalid, a petitioner's death sentence must be vacated even if there is another valid aggravating circumstance. *Stephens v. Zant, supra,* at 406. However, *Stromberg* and *Stephens* dealt with multiple grounds for the same verdict, not multiple verdicts for the same sentence. Here, without considering the sufficiency of the evidence of the other three death sentences, petitioner's argument must be rejected since *both* of the aggravating circumstances found by the jury in the case of Anne Tierney were valid. Petitioner's death sentence cannot be set aside on this ground.

In ground six, petitioner contends that his death sentence was affirmed in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States because the Louisiana Supreme Court reviewed only one of the two aggravating circumstances found by the jury to support its death verdict.

This argument is relevant only to a claim under *Stromberg v. California, supra,* and *Stephens v. Zant, supra,* that if one of the aggravating circumstances found by the jury is invalid, a petitioner's death sentence must be vacated even if there is another valid aggravating circumstance. *Stephens* and *Stromberg* concerned multiple bases for the *same* verdict whereas here we are confronted with *multiple* verdicts resting on the same grounds. Since both bases for the death sentence for the murder of Anne Tierney are constitutionally sufficient, there is no valid argument under *Stromberg* and *Stephens* that petitioner's death sentence is unconstitutional.

Therefore, the absence of consideration by the Louisiana Supreme Court of the aggravating circumstance that "the offense was committed in an especially heinous, atrocious, or cruel manner" in each of the four death sentences does not render the death sentence for the brutal killing of Anne Tierney unconstitutional. The jury was clearly instructed that it was to consider each verdict separately. (Vol. 10, State TR 1617–18).

■ Because the purpose of reviewing all of the aggravating circumstances found by the jury is to insure that none was unconstitutional, the failure of the Louisiana Supreme Court to review both of the aggravating circumstances found by the jury where they are clearly both valid, at least in regard to the killing of Anne Tierney, is totally harmless. A violation of procedural right designed to protect a substantive right is harmless when the substantive right is clearly met. *Cf. Pinto v. Pearce,* 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31 (1967). The death sentence for the atrocious murder of Anne Tierney is constitutionally valid and therefore, this ground must be rejected.

■ In ground seven petitioner argues that the Louisiana Supreme Court's failure to review every aggravating circumstance found by the jury in every capital case will result in arbitrary and capricious sentencing in violation of the Eighth and Fourteenth Amendments. This ground should be rejected.

■ The petitioner's argument that this review process by the Louisiana Supreme Court will result in arbitrary and capricious *sentencing* is meritless. The sentencing process and the appellate review process in Louisiana, and elsewhere, are entirely separate and raise entirely different issues. *See Brown v. Wainwright,* 392 So.2d 1327, 1331–32 (Fla.1981). A Louisiana jury's decision to impose the death penalty represents its finding that at least one aggravating factor is present and its decision that the defendant merits the death penalty despite the presence of relevant mitigating factors. Focusing the jury's decision on the aggravating and mitigating factors present in each case provides a rational means of differentiating among the various bases in which a defendant could receive the death penalty. *See* Gillers, *Deciding Who Dies,* 129 U.Pa.L.Rev. 1, 29–30 & n.136 (1980). The fact that one of the bases upon which the jury returned a capital sentence is unconstitutional does not indicate that there is no rational basis for distinguishing between that case and any or all others. By definition, there is a rational basis for differentiating among the different cases even where one of the bases in one case is unconstitutional because no two cases necessarily have the same mitigating factors. *Id.* The different cases can be rationally distinguished on the ground that the juries found at least one aggravating circumstance and concluded that the defendant deserved the death penalty despite the evidence the defendant offered in mitigation. Therefore, the defendant's argument that the Louisiana review practice he challenges is unconstitutional will result in arbitrary sentencing must be rejected.

To the extent that the petitioner's challenge is to either the Louisiana appellate review process or the Louisiana capital sentencing process considered as a whole, this practice also does not increase the likelihood that juries will act arbitrarily simply because the Louisiana Supreme Court may affirm capital sentences where one of the bases for the sentence is unconstitutional.

The fact that another petitioner's sentence may not be reversed because of this practice despite the presence of an unconstitutional aggravating factor, just as the fact that another petitioner's sentence may be reversed on the ground that one of the aggravating circumstances is unconstitutional, does not demonstrate that the Louisiana sentencing or appellate review procedure will produce irrational results. In this regard, there is no difference between reversing a capital sentence on the ground that one of the aggravating factors is unconstitutional and reversing a capital sentence because of an evidentiary error at the guilt or penalty stages, and the fact that other capital sentences will be or will not be reversed because of errors at trial or sentencing does not demonstrate that the Louisiana capital punishment procedures are unconstitutional. The fact that every capital sentence imposed by a jury does not stand up on appeal does not indicate that the Louisiana capital sentencing process considered as a whole will produce the irrational results that the Supreme Court held unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); it simply means that reversible errors were committed in some capital cases.

The purpose for reviewing all the aggravating circumstances found by the jury is to ensure that none of the aggravating circumstances in a particular case are unconstitutional. Any rights that a defendant has under *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931) apply only to his own case and only where one of the possible grounds on which the jury could have relied is unconstitutional. Where the jury has not relied upon a particular aggravating circumstance to impose a capital sentence, a petitioner does not have standing to challenge any alleged defects in other aggravating circumstances because the presence of other aggravating circumstances does not have any effect on his case. *County Court of Ulster County v. Allen*, 442 U.S. 140, 154–57, 99 S.Ct. 2213, 2223–24, 60 L.Ed.2d 777 (1979). Likewise, alleged defects in the basis for a capital sentence imposed upon another petitioner

that are different from the defects alleged in any one petitioner's sentence do not provide a basis upon which a petitioner can challenge his own sentence. That other sentences may be erroneous does not provide a petitioner with a basis for arguing that his own sentence is erroneous. Any right he has under *Stromberg* must be predicated upon defects in his own sentence and in the bases upon which the jury relied in his case because just as *Stromberg* does not provide a petitioner with any challenge to aggravating circumstances not relied upon by the jury in his case, it does not provide a petitioner with a challenge to his sentence based upon defects in other sentences. The petitioner can not draw any support for his argument from either *Stromberg* or *Stephens v. Zant*, 631 F.2d 397, 405–07 (5th Cir. 1981), *modified*, 648 F.2d 446 (1981), because the problem discussed there dealt with a particular sentence for a particular prisoner.

█ In ground eight petitioner claims that the Louisiana Supreme Court's appellate review procedure in capital cases is unconstitutional because (1) that court only reviews cases in which a sentence for first degree murder is imposed in the district in which the petitioner's sentence was imposed, and because (2) that Court reviews only other first degree murder convictions rather than all other homicide cases. This ground should be rejected.

Article 905.9 of the Louisiana Code of Criminal Procedure requires the Louisiana Supreme Court to review "every sentence of death to determine if it is excessive," and authorizes the Louisiana Supreme Court to establish procedures "necessary to satisfy constitutional criteria for review." These procedures are set out in Louisiana Supreme Court Rule 28:

Supreme Court Rule 28

Rule 905.9.1 Capital sentence review (applicable to La.C.Cr.P. Art. 905.9)

Section 1. Review Guidelines. Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:

(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and

(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and

(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Section 2. Transcript, Record. Whenever the death penalty is imposed a verbatim transcript of the sentencing hearing, along with the record required on appeal, if any, shall be transmitted to the court within the time and in the form, insofar as applicable, for transmitting the record for appeal.

Section 3. Uniform Capital Sentence Report; Sentence Investigation Report.

(a) Whenever the death penalty is imposed, the trial judge shall expeditiously complete and file in the record a Uniform Capital Sentence Report (see Appendix "B"). The trial court may call upon the district attorney, defense counsel and the department of probation and parole of the Department of Corrections to provide any information needed to complete the report.

(b) The trial judge shall cause a sentence investigation to be conducted and the report to be attached to the uniform capital sentence report. The investigation shall inquire into the defendant's prior delinquent and criminal activity, family situation and background, education, economic and employment status, and any other relevant matters concerning the defendant. This report shall be sealed, except as provided below.

(c) Defense counsel and the district attorney shall be furnished a copy of the completed Capital Sentence Report and of the sentence investigation report, and shall be afforded seven days to file a written opposition to their factual contents. If the opposition shows sufficient grounds, the court shall conduct a contradictory hearing to resolve any substantial factual issues raised by the reports. In all cases, the opposition, if any, shall be attached to the reports.

(d) The preparation and lodging of the record for appeal shall not be delayed pending completion of the Uniform Capital Sentence Report.

Section 4. Sentence Review Memoranda; Form; Time for Filing.

(a) In addition to the briefs required on the appeal of the guilt-determination trial, the district attorney and the defendant shall file sentence review memoranda addressed to the propriety of the sentence. The form shall conform, insofar as applicable, to that required for briefs.

(b) The district attorney shall file the memorandum on behalf of the state within the time provided for the defendant to file his brief on the appeal. The memorandum shall include:

i. a list of each first degree murder case in the district in which sentence was imposed after January 1, 1976. The list shall include the docket number, caption, crime convicted, sentence actually imposed and a synopsis of the facts in the record concerning the crime and the defendant.

ii. a synopsis of the facts in the record concerning the crime and the defendant in the instant case,

iii. any other matter relating to the guidelines in Section 1.

(c) Defense counsel shall file a memorandum on behalf of the defendant within the time for the state to file its brief on the appeal. The memorandum shall address itself to the state's memorandum and any other matter relative to the guidelines in Section 1.

Section 5. Remand for Expansion of the Record. The court may remand the matter for the development of facts relating to whether the sentence is excessive.

Added Nov. 22, 1977, effective Jan. 1, 1978.

■ These procedures satisfy any constitutional requirement for appellate review of capital cases. There is no general federal constitutional right to state appellate review of state criminal convictions. *Estelle v. Dorrough,* 420 U.S. 534, 536, 95 S.Ct. 1173, 1175, 43 L.Ed.2d 377 (1975); *Ross v. Moffitt,* 417 U.S. 600, 610–11, 94 S.Ct. 2437, 2443–44, 41 L.Ed.2d 341 (1974); *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956); *McKane v. Durston,* 153 U.S. 684, 687, 14 S.Ct. 913, 914, 38 L.Ed. 867 (1894). There is also no general federal constitutional right to state appellate review of state convictions and capital sentences. *Kohl v. Lehlback,* 160 U.S. 293, 297, 16 S.Ct. 304, 305, 40 L.Ed. 432 (1895); *Bergemann v. Backer,* 157 U.S. 655, 658–59, 15 S.Ct. 727, 728–29, 39 L.Ed. 845 (1895). Therefore, there is no general federal constitutional requirement that the State of Louisiana afford a defendant convicted of a capital offense any appellate review of his conviction and sentence at all. Accordingly, the Louisiana appellate review procedures can not be unconstitutional because they provide for review of only first degree murder cases in the district in which a defendant was sentenced to receive the death penalty.

■ The Supreme Court's capital punishment decisions also do not require the state to provide for appellate review of the propriety of a particular defendant's death sentence. "Because of the uniqueness of the death penalty, *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. . . . *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 188, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). In *Gregg,* the Supreme Court held that the procedures outlined in the Model Penal Code providing for a bifurcated trial process with separate guilt or innocence and penalty stages and with aggravating and mitigating factors which can guide a sentencer's deliberations can satisfy the requirement that the death penalty not be imposed in an arbitrary or capricious manner:

> In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drawn statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Id.* at 195, 96 S.Ct. at 2935. None of the Supreme Court's cases decided along with *Gregg v. Georgia* held that appellate review was constitutionally required. Each case only stated that appellate review was an additional protection against arbitrariness and caprice. *Gregg v. Georgia, supra,* 428 U.S. at 204, 207, 96 S.Ct. at 2939, 2941; *id.* at 211, 223–24, 96 S.Ct. at 2948–49 (White, J., concurring in the judgment); *Proffitt v. Florida,* 428 U.S. 242, 253, 259–60, 96 S.Ct. 2960, 2969–70, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). None of the Supreme Court's capital punishment decisions have held that appellate review of a capital sentence is constitutionally required. While the Georgia, Florida and Texas appellate review processes all provide for appellate review, each system must be examined by itself and must be examined in context of the entire sentencing and review process. *Gregg v. Georgia, supra,* 428 U.S. at 195, 96 S.Ct. at 2935.

Even if appellate review is required, the Louisiana procedures satisfied any federal constitutional requirement. They provide a satisfactory means of ensuring that the concerns expressed in *Furman* will be satisfied.

Neither of the petitioner's challenges have merit. The Fifth Circuit rejected the first argument in *Williams v. Blackburn,* 649 F.2d 1019, at 1021 (5th Cir. 1981) because that argument did not even "hint at unconstitutionality." Districtwide review is a rational means of reviewing the actions of juries in sentencing defendants to death because juries are drawn on a districtwide basis rather than a statewide basis. Therefore, limiting appellate review to the particular district in which a particular defendant received a capital sentence is an eminently reasonable method of ensuring that juries are not acting arbitrarily or capriciously. The appellate review process in Georgia, Florida and Texas is performed on a statewide rather than a districtwide basis, but the Fifth Circuit held in *Williams* that the difference was constitutionally inconsequential. The petitioner's second argument was rejected by the Supreme Court in *Proffitt v. Florida, supra,* 428 U.S. at 259 n.16, 96 S.Ct. at 2970 n.16. In *Proffitt,* the Supreme Court rejected the argument that the Florida appellate review process was unconstitutional because the Florida Supreme Court reviewed only capital cases in its appellate review process and did not review cases in which a sentence less than death was imposed or in which the defendant was convicted of a crime less than a capital offense. In Louisiana, the Louisiana Supreme Court reviews *all* first degree murder cases in the district in which sentence was imposed after January 1, 1976. The Louisiana Supreme Court therefore reviews cases from a broader pool of cases than the Supreme Court held sufficient in *Proffitt* to ensure that the death penalty is not being handed down arbitrarily or capriciously. Therefore, in light of *Williams* and *Proffitt* the petitioner's arguments must be rejected, even assuming that appellate review of capital sentences is required.

In ground nine petitioner argues that he was deprived of his Eighth and Fourteenth Amendment constitutional right to the guided exercise of sentencing discretion in a capital case due to the trial court's instructional errors regarding mitigating circumstances. This ground should be rejected.

The court's charge (Vol. 10, State TR 1617–1621) at the sentencing stage of the trial, reviewed in its totality, *Stephens v. Zant, supra,* 631 F.2d at 405, demonstrates no constitutional violation of petitioner's rights. Article 905.3 of the Louisiana Code of Criminal Procedure provides, as follows:

"Art. 905.3 SENTENCE OF DEATH;
JURY FINDINGS

A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists, and after consideration of any mitigating circumstances, recommends that the sentence of death be imposed. The jury shall be furnished with a copy of the statutory aggravating and mitigating circumstances."

The jury and counsel for the parties were provided with a copy of the mitigating circumstances. (Vol. 10, State TR 1618). Additionally, the jury was instructed that they must consider mitigating circumstances before a death sentence should be imposed and the list of mitigating circumstances set forth in Art. 905.5 was read to the jury in the charge as follows:

(a) The offender has no significant prior history of criminal activity;

(b) The offense was committed while the offender was under the influence of extreme mental or emotional distrubance;

(c) The offense was committed while the offender was under the influence or under the domination of another person;

(d) The offense was committed under circumstances which the offender reasonably believed to provide a moral justification or extenuation for his conduct;

(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication;

(f) The youth of the offender at the time of the offense;

(g) The offender was a principal whose participation was relatively minor;

(h) Any other relevant mitigating circumstance.

The jury was further instructed—"Even if you should find beyond a reasonable doubt that one or more aggravating circumstances exists and even if you should determine that no mitigating circumstances exist, although under the law you would be authorized to impose a sentence of death, you are not required to do so." (Vol. 10, State TR 1619, 1620). No objection to the charge was made by counsel for petitioner. These mitigating circumstances are consistent with and almost identical to those set forth in the Florida and Georgia statutes and considered constitutionally appropriate in their capital sentencing procedures. *Proffitt v. Florida, supra,* 428 U.S. at 248, 96 S.Ct. at 2964 and *Gregg v. Georgia, supra,* 428 U.S. at 193, 96 S.Ct. at 2934. *Cf. Lockett v. Ohio, supra,* 438 U.S. at 605, 98 S.Ct. at 2965. The petitioner's right under *Lockett v. Ohio, supra,* were also fully guaranteed because the jury was permitted to consider, and base its judgment not to impose a death sentence upon, any relevant mitigating circumstances. *See Stephens v. Zant, supra,* 631 F.2d at 405.

In ground ten petitioner challenges the constitutionality of the Louisiana death penalty statute under the Eighth and Fourteenth Amendments on the ground that (1) the statute fails to provide adequate statutory guidance for the jury's consideration of mitigating circumstances and for the weighing of aggravating and mitigating factors; (2) the statute fails to provide any burden or standard of proof for the finding of mitigating factors; and (3) the statute fails to require that the jury enumerate the mitigating factors considered, thereby preventing an appellate court from being able to rationally review a death sentence. This ground should be rejected.

As to petitioner's first argument, the statute sets out several specific mitigating factors for the jury to consider, and one which permits the jury to consider any other relevant mitigating factor. The statute, Art. 905.5 of the Louisiana Code of Criminal Procedure is set forth on pages 32 and 33 of this report. This statute clearly satisfied the requirements of *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) that the jury not be precluded from considering any relevant mitigating evidence and that the jury be permitted to impose a sentence less than death on the basis of relevant mitigating evidence. This is the only requirement regarding mitigating factors that a state statute must satisfy. A capital statute need not require the jury to *weigh* aggravating and mitigating factors in order to satisfy constitutional requirements. The Texas capital statute upheld in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) permitted the jury to consider evidence in mitigation but did not require that the jury weigh this evidence in light of statutory factors aggravating the offense. Instead, the Texas statute directed the jury to consider and answer three questions to determine a defendant's sentence. The Fifth Circuit held in *Spinkellink v. Wainwright,* 578 F.2d 582, 621 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), that *Lockett* did not undermine the constitutionality of the Texas statute: "It is unmistakably clear from this language in *Lockett* that the Court still views *Gregg v. Georgia, supra,* and the companion cases, . . . as sound law." *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its companion cases, and *Lockett v. Ohio, supra,* require the state to direct and guide a jury's decision to impose the death penalty and prevent the state from denying the jury the right to consider relevant mitigating evidence and to base its decision to impose a lesser penalty than death upon such evidence. The Louisiana capital sentencing procedures satisfy those requirements.

As to petitioner's second argument, the statute's failure to allocate the burden of proof or to set a standard of proof for

mitigating factors does not render the statute unconstitutional. As the Supreme Court held in *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976), "[w]hile the various factors [in the Florida capital punishment statute] to be considered by the sentencing authorities do not have numerical weights assigned to the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." Therefore, the absence of any allocation of the burden of proof or a standard of proof with regard to mitigating factors does not violate *Furman* or its progeny by leading to arbitrary or capricious capital sentencing. The absence of these provisions also does not violate the principle expressed in *Lockett v. Ohio, supra.* *Lockett* prevents the state from denying the jury the right to consider and act upon relevant mitigating evidence. However, *Lockett* does not require the jury to impose a sentence less than death simply because the defendant has demonstrated or the state has failed to disprove under any standard of proof for either party that there are mitigating factors present in the defendant's case. The constitution does not define "mitigating factor" and does not set out any factors that are mitigating. Neither does the constitution establish any factors that prevent a jury from imposing the death penalty upon a person convicted of intentionally murdering his victim. Youth, for example, may be a mitigating factor set out in a capital punishment statute or may be demonstrated in a particular case despite the absence of mention of it in the statute. But the fact that a defendant may be only 21 does not prevent the state from imposing the death penalty upon him if the jury imposes that sentence. The existence of a mitigating factor does not prevent a jury from sentencing a capital defendant to death. A jury may impose the death penalty even if each juror is convinced beyond any doubt that a mitigating factor is present. Therefore, even if the state is required to disprove the existence of a mitigating factor beyond *any* doubt, which surely is the heaviest burden the state could be required to bear, the jury may impose the death penalty nevertheless if it believes and concludes that death is the appropriate punishment for the defendant. Therefore, even if *Lockett* required the state to disprove a mitigating factor beyond any doubt, which *Lockett* surely does not require, the Louisiana capital punishment statute would be constitutional. Therefore, because neither *Furman* nor *Lockett* required the state to bear any burden of disproving the existence of mitigating factors, and because a jury could impose the death penalty upon a defendant even if these cases did, the Louisiana capital punishment statute can not be held unconstitutional on the basis of this argument by the petitioner.

As to petitioner's third argument, the absence of any requirement that the jury enumerate the mitigating factors that it considered does not prevent an appellate court from rationally reviewing the death sentence imposed by the jury. None of the statutes held in *Gregg v. Georgia, supra,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida, supra,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); or *Jurek v. Texas, supra,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, required the jury to specify what mitigating factors it considered and evaluated. Therefore, the absence of such a requirement does not violate *Furman.* The absence of such a requirement also does not violate *Lockett.* An appellate court is not required under *Lockett* to substitute its decision for the jury, and absence of the jury's enumeration of the mitigating factors it evaluated does not prevent from rational review a death sentence imposed upon a particular defendant or from comparing a particular defendant's death sentence with other death sentences handed down. *Lockett* relied upon *Gregg, Proffitt,* and *Jurek* and did not undermine the discussion in those cases of the appellate review process described there. The factors

set out in the Louisiana code regarding appellate review of sentences satisfy any federal constitutional requirement for appellate review of capital sentences, which must be considered in light of the Louisiana capital punishment procedures as a whole. *See, e. g., Gregg v. Georgia,* 428 U.S. at 198, 96 S.Ct. at 2936.

■ In ground seventeen, the petitioner argues that Article 905.4 of the Louisiana Code of Criminal Procedure is impermissibly vague and overbroad because the construction of that statute by the Louisiana Supreme Court fails to take into account the appropriate mental state of the offender at the time of the murder. This ground should be rejected.

The petitioner has standing to raise these challenges to this statute only as it applies to him. As the Supreme Court held in *County Court of Ulster County v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979):

> "[a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. ... A limited exception has been recognized for statutes that broadly prohibit speech protected by the First Amendment ....
>
> This exception has been justified by the overriding interest in removing illegal deterrents to the exercise of the right of free speech .... That justification, of course, has no application to a statute that enhances the legal risks associated with riding in vehicles containing dangerous weapons."

(citations omitted). That principle is applicable here because there is surely no "overriding interest in removing illegal deterrents to the right" to fire a pistol in the close quarters of a house trailer at four of one's fellow citizens in order to murder all four.

In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court held that an aggravating factor in the Florida capital punishment statute that had received an interpretation by the Florida Supreme Court that is identical to the interpretation Article 905.4(d) as received by the Louisiana Supreme Court was not unconstitutionally vague. *Id.* at 256, 96 S.Ct. at 2968 (opinion of Stewart, Powell & Stevens, JJ.). The Florida Supreme Court in *Alvord v. State,* 322 So.2d 533 (Fla.1975) had interpreted the aggravating factor "[t]he defendant knowingly created a great risk of death to many persons" to include the circumstances in which a defendant "obviously murdered two of the victims in order to avoid a surviving witness to the [first] murder." *Id.* at 540. In the petitioner's case, the Louisiana Supreme Court interpreted the aggravating factor "[t]he offender knowingly created a risk of death or great bodily harm to more than one person," to include the circumstance in which "the defendant murdered the victims one after the other as a part of a single consecutive course of conduct in order to prevent any of the victims from reporting to the police the murders of the others." *State v. Martin, supra,* 376 So.2d at 312. *See State v. Sonnier,* 379 So.2d 1336, 1362 (La.1979) (same interpretation of Article 905.4(d)). The interpretation of this factor by the Louisiana Supreme Court is identical to the interpretation of the parallel aggravating factor in the Florida capital punishment statute upheld in *Proffitt.* Therefore, the petitioner's vagueness challenge to this part of the Louisiana capital punishment statute must fail.

■ The petitioner's overbreadth challenge to Article 905.4(d) based on its failure to include consideration of the defendant's mental state at the time of the offense should likewise be rejected. To begin with, the plain language of the statute *does* include consideration of a defendant's mental state at the time of the offense. In addition, there is no federal constitutional requirement that the state's list of *aggravating* factors include consideration of the defendant's mental state at the time of the

offense. While the Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such," *Ingraham v. Wright*, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977), this limitation is "to be applied sparingly." *Id.* In this regard, the Supreme Court "has never articulated a general constitutional doctrine of *mens rea*," *Powell v. Texas*, 392 U.S. 514, 535, 88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254 (1968) (footnote omitted), and has never held that the Constitution demands that the state's definition of a crime must include a *mens rea* element. In fact, the Supreme Court has held to the contrary. *See Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910) (strict liability crimes do not violate due process clause). That same principle is operative here. A state could validly limit the aggravating factors for murder to, for instance, the killing of a person under 18 or over 65 without offending any principle expressed in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) or any of the Court's later capital punishment decisions, and Congress could make the killing of the President of the United States an aggravating factor without requiring any mental state as an element of that factor. The defendant has the right to introduce evidence of a diminished mental capacity as a basis for attempting to convince the jury to return a sentence less than death, *see Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), but that right does not extend so far as to require the state to define its aggravating factors to include a consideration of the defendant's mental state at the time he commits a murder. *Cf. id.* at 614 n.2, 98 S.Ct. at 2969 n.2 (Blackmun, J., concurring in part and concurring in the judgment). Therefore the petitioner's overbreadth challenge to Article 905.-4(d) must also fail because the state of Louisiana is not constitutionally required to define the aggravating factors for intentional murder to include a reference to the defendant's mental state.

■ In ground nineteen petitioner claims that the affirmance of his death sentence by the Louisiana Supreme Court on the basis of a nonstatutory aggravating factor deprived him of his due process right to have the validity of his sentence reviewed on the basis of the aggravating factors relied upon by the jury at trial. He points to language in the Louisiana Supreme Court opinion on direct appeal in his case stating that "[i]t is clear from a reading of our Capital Sentencing Law that killing a victim in order to prevent that person from being able to report a separate crime . . . is strictly condemned," *State v. Martin*, 376 So.2d at 313, and argues that this language demonstrates that the Louisiana Supreme Court affirmed his sentence on the basis of this factor, which is not an aggravating factor under Louisiana law. The affirmance by an appellate court of a capital sentence on the basis of an aggravating factor not relied upon by the sentencing jury violates the due process clause, *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (per curiam); cf. *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948), the petitioner argues that his death sentence can not stand. This ground should be rejected.

In *Cole v. Arkansas, supra,* 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644, the defendants had been charged with, tried for, and convicted of violating § 2 of Act 193 of the 1943 Arkansas legislature. On appeal, the Arkansas Supreme Court declined to consider the validity of the defendants' conviction under § 2 because it concluded that the defendants had violated § 1 of the same Act, and the court affirmed their convictions on that ground. The Supreme Court reversed the Arkansas Supreme Court reasoning that:

> "No principle of procedural due process is more clearly established than that notice of the specified charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal. . . . It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to

convict him upon a charge that was never made."

*Id.* at 201, 68 S.Ct. at 517. The Supreme Court relied on the *Cole* decision in *Presnell v. Georgia, supra,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207, to vacate the judgment of the Georgia Supreme Court affirming the defendant's sentence. The Supreme Court interpreted the opinion of the Georgia Supreme Court to uphold the defendant's sentence on the basis of an aggravating factor not considered by the jury at the sentencing phase. Concluding that the principle expressed in *Cole* was applicable to an appellate court's decision to affirm a defendant's sentence as well as his conviction, the Court vacated the judgment of the Georgia Supreme Court.

Neither *Cole* nor *Presnell* are applicable here. First, at the sentencing phase of the petitioner's trial the jury found two aggravating factors to exist: "(1) [t]he offender knowingly created a risk of death or great bodily harm to more than one person," and "(2) [t]he offense was committed in an expecially heinous, atrocious, or cruel manner." *State v. Martin, supra,* 376 So.2d at 311–12. The Louisiana Supreme Court affirmed the jury finding of the first aggravating factor and declined to review the jury's finding of the second aggravating factor. *Id.* at 312. The language the petitioner complains of is found in an entirely different section of the Louisiana Supreme Court's opinion, a section devoted to a comparative analysis of the petitioner's case with other capital cases in Louisiana. *Id.* at 313 and 312–13. In considering the jury's verdict, however, the Louisiana Supreme Court did not even utter this statement, much less affirm the petitioner's sentence on the basis of a factor not relied upon by the jury which had imposed the sentence. Therefore, it is clear that *Cole* and *Presnell* are entirely inopposite to this case because the Louisiana Supreme Court did not affirm the petitioner's sentence on any basis different from that basis which the jury relied upon to impose the petitioner's sentence in the first instance.

Second, the language employed by the Louisiana Supreme Court merely constituted a description of the petitioner's crime, written as part of that Court's comparative analysis of the petitioner's case with other capital cases. As the Louisiana Supreme Court observed in its opinion in this case, "[t]he purpose of this requirement is to aid this Court in determining whether the sentence is disproportionate to the penalty imposed in similar cases in the state, considering both the crime and the defendant." *Id.* at 312. The purpose of this review process then is not to determine whether the decision made by *this* jury or *these* facts in *this* case is *correct,* but to compare the decisions made by *other* juries considering *other* facts with the decision made by the jury in the case presently under review to determine whether they *all* are *consistent.* These two types of analyses are entirely different and a linguistic exercise in characterizing the case under review with other cases, which is at the heart of the comparative analysis performed by the Louisiana Supreme Court, does not implicate the concerns forming the basis for the *Cole* and *Presnell* decisions. Consideration of other cases in this process does not deprive a defendant of his right to fair notice of the charges against him but instead provides him with an additional safeguard against his sentence being carried out. Therefore, the Louisiana Supreme Court's use of this language in the part of its opinion devoted to a comparative analysis did not violate *Cole* or *Presnell* because those cases are not implicated in such an analysis, and because the phraseology employed by the Louisiana Supreme Court can not be torn from the context in which it was written.

■ In ground twenty-one petitioner has argued that the death penalty is a disproportionate punishment as applied to him because it is an excessive penalty in light of all the facts and circumstances of his case. This ground should be rejected.

The petitioner argues that the death penalty is a disproportionate punishment *for him* in light of all the circumstances of his background and the crime. The inquiry

suggested by the petitioner is whether the Eighth Amendment forbids the imposition of a particular punishment, here capital punishment, upon a particular person. This inquiry is entirely different from the inquiries the Supreme Court has performed under the Eighth Amendment. The initial question, then, is whether the Eighth Amendment governs the relationship between the punishment to be imposed and the offender upon whom it will be imposed.

The principle that a punishment may be a disproportionate penalty has been argued as a ground for invalidating that punishment throughout the history of Anglo-American criminal law. But in every instance in which the question of proportionality has been raised under the Eighth Amendment, the inquiry has focused on the relationship between the punishment and the *crime* rather than the *criminal.* The Supreme Court has never recognized a claim under the Eighth Amendment that a punishment can be a disproportionate penalty for a particular offender regardless of the crime(s) he has committed.

A majority of the Court did not embrace the principle that proportionality was a concern of the Eighth Amendment until 1910 in *Weems v. United States, supra,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793. In *Weems, supra,* the Court held, over the dissent of Justices Holmes and White, that the imposition of the Philippine punishment of *cadena temporal* was cruel and unusual for the crime of falsifying a public record. While the *Weems, supra,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, Court did hold for the first time that a criminal punishment could be excessive, the comparison the Court performed was between "the *mischief* and the remedy," *id.* at 379, 30 S.Ct. at 554, not the miscreant and the remedy. As the Court unanimously recognized only last term in *Rummel v. Estelle, supra,* 445 U.S. at 273–74, 100 S.Ct. at 1139; *id.* at 289–90, 100 S.Ct. at 1147 (Powell, J., dissenting), the *Weems, supra,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, proportionality analysis focused upon a comparison between the punishment and the crime serving as the predicate for that punishment;

"Such penalties for such *offenses* amaze those who have formed their conception of the relation of a state to even its offending citizens from the practice of the American commonwealths, and believe that it is a precept of justice that punishment for crime should be graduated and proportioned to *offense.*

*Weems v. United States, supra,* 217 U.S. at 366–67, 30 S.Ct. at 548–49 (emphasis added).

The Supreme Court's recent capital punishment decisions have recognized that the Eighth Amendment forbids "excessive" punishments but those decisions, like the others, have framed the test for determining whether a punishment is "excessive" in terms of a comparison between the punishment and the crime. For instance, in *Gregg, supra,* 428 U.S. at 187, 96 S.Ct. at 2931, the Court reviewed its previous Eighth Amendment decisions and observed that "the Court has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner." *Gregg v. Georgia, supra,* 428 U.S. at 171, 96 S.Ct. at 2924. The *Gregg* Court noted that the Court's earlier decisions in *Weems, supra,* 217 U.S. at 349, 30 S.Ct. at 544, and *Trop v. Dulles, supra,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (plurality opinion), were examples of the " 'wider application' " that the Court had attributed to the Eighth Amendment, *Gregg v. Georgia, supra,* 428 U.S. at 171–72, 96 S.Ct. at 2924, because for example, both cases had stated that the Eighth Amendment was concerned with prohibiting excessive punishments. Both *Weems, supra,* 217 U.S. at 349, 30 S.Ct. at 544 and *Trop, supra,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596, however, limited the proportionality doctrine adopted in *Weems,* and revivified in *Trop* to a comparison of the punishment and the crime. *Weems v. United States, supra,* 217 U.S. at 366–67, 30 S.Ct. at 549. *Trop v. Dulles, supra,* 356 U.S. at 100, 78 S.Ct. at 598 ("[f]ines, imprisonment and even execution may be imposed depending upon the enormity of the *crime,"*) (emphasis

added). *See Gregg v. Georgia, supra,* 428 U.S. at 171–72, 96 S.Ct. at 2924. Therefore the " 'wider application' " of the Eighth Amendment begun in *Weems* and carried over into the Court's recent capital punishment decisions by *Gregg* does not include the comparison of the punishment with the offender that the petitioner has suggested here.

The Supreme Court's decision in *Coker v. Georgia, supra,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, both recognized the limited nature of the proportionality doctrine and expressly refused to incorporate into that doctrine the comparison suggested by the petitioner here. Discussing the Court's decisions in *Gregg* and its companion cases handed down the previous term, the Supreme Court in *Coker* observed that the Court's prior capital punishment decisions had established the principle that "the Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the *crime* committed," *id.* at 592, 97 S.Ct. at 2866 (emphasis added), and concluded that the death penalty was an excessive punishment for the crime of rape of an adult woman. The *Coker* Court made quite clear, however, that its proportionality analysis focused upon the relationship between the penalty and the offense and not between the penalty and the offender. First, the Court based its independent analysis of the constitutionality of the death penalty for rape solely upon the harm produced by that crime as defined under Georgia law regardless of the person committing that crime. *Id.* at 598, 97 S.Ct. at 2869. Second, the Court refused to consider the defendant's prior record as a factor enhancing the heinousness of his acts. *Compare id.* at 598–99, 97 S.Ct. at 2869–70, *with id.* at 606–07, 97 S.Ct. at 2873–74 (Burger, C. J., dissenting). And third, the Court rejected the test proposed by Justice Powell in his separate opinion which would have included consideration of "the cruelty or viciousness of the offender, the circumstances and manner in which the offense was committed, and the consequences suffered by the victim." *id.* at 602 n.1, 97 S.Ct. at 2871. (Powell, J.,

concurring in the judgment in part and dissenting in part), as a measure of the heinousness of the defendant's crime in favor of a per se rule forbidding the imposition of capital punishment for the rape of any adult woman under the Georgia definition of that offense. Therefore, despite the *Coker* Court's reliance upon the proportionality doctrine to strike down the death sentence there, the Court made quite clear that the disproportionality found to exist was between the punishment imposed upon the defendant and the harm he inflicted upon his victim as measured by the state law definition of the offense he committed. The *Coker* Court's explicit rejection of any comparison of the punishment with the offender, or with both the offense and the offender, demonstrates that the Eighth Amendment does not perform such an inquiry.

The Supreme Court has refused to follow petitioner's approach because a court simply cannot compare the severity of a punishment with the *evidence* proffered by a defendant describing his background or the circumstances of his offense without succumbing to reliance upon its own subjective, personal opinion regarding the propriety of the punishment for the offender in question. The decision whether to impose a sentence of death or some other lesser sentence is a question of fact. The sentencing agency in each case must make a decision based upon the aggravating and mitigating circumstances relevant to that case, considered in light of the community's values and attitudes towards vengeance, retribution, deterrence and isolation which a *jury* may consider even though a legislature, perhaps may not, *but see Gregg v. Georgia, supra,* 428 U.S. at 183 n.28, 96 S.Ct. at 2930 n.28, because a jury is not in the same position as the state to incarcerate a defendant permanently, *see Terrebonne v. Blackburn,* 646 F.2d 997, 1000 (5th Cir. 1981) (en banc) (Louisiana law authorizes governor to commute sentence, citing *State v. Ledet,* 337 So.2d 1126 (La.1976)), whether the death penalty or some lesser punishment is the appropriate penalty for the

defendant in that case. In Louisiana, proof that the defendant has committed a capital offense and proof that at least one aggravating circumstance exists only renders the defendant eligible to receive the death penalty and permits the jury to consider imposing it upon him. The inquiry then proceeds to the question of whether the death penalty should be imposed upon the defendant and that inquiry, particular when conducted by a jury as in Louisiana, necessarily involves an assessment of the community's moral values. *See Gregg v. Georgia, supra,* 428 U.S. at 181, 96 S.Ct. at 2928. A federal court simply can not play the role of a substitute jury in the process of determining whether a particular defendant merits the death penalty or some lesser punishment because federal courts are not permitted to insert their own subjective judgments into the question of whether a punishment challenged under the Eighth Amendment is constitutional *Coker v. Georgia, supra,* 433 U.S. at 592, 97 S.Ct. at 2866. A federal court can not engage in the same moral decisionmaking process that a jury can. A juror is entitled to consider his own and the community's subjective attitudes toward vengeance, retribution, deterrence, and isolation in determining whether to impose the death penalty. This consideration is at the heart of the decision that the jury is called upon to make at the penalty stage of a capital case because " 'one of the most important functions any jury can perform in making . . . a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary community values and the penal system.' " *Gregg v. Georgia, supra,* 428 U.S. at 181, 96 S.Ct. at 2929 (quoting *Witherspoon v. Illinois, supra,* 391 U.S. at 519 n.15, 88 S.Ct. at 1775 n.15). A federal court can not indulge in this sort of inquiry without adding its own subjective perceptions into the calculus, however. Because a federal court can not perform the inquiry suggested by the petitioner without violating its duty under *Gregg* and *Coker* not to impose its own subjective preferences upon the judgment of the state and the community, it is evident that the inquiry

suggested by the petitioner can not be performed under the Eighth Amendment.

In addition, the inquiry suggested by the petitioner, if followed and accepted, would require this Court to conclude that the state is not entitled to impose capital punishment upon a person regardless of the heinousness of the crime(s) he committed simply because he has been able to introduce *evidence* purporting to demonstrate that *he* should have not been executed. This conclusion would go far beyond anything even remotely suggested by the Supreme Court's recent capital punishment decisions and would limit the state's authority to define capital crimes according to a particular defendant's ability to introduce *evidence* that *he* considered mitigating. The Eighth Amendment limits the state's authority to impose capital punishment as the penalty for particular crimes, *Coker v. Georgia, supra,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, and also permits a defendant in a capital case to introduce at the sentencing stage evidence that he believes will mitigate the severity of his crimes or background, *Lockett v. Ohio, supra,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, but the Eighth Amendment does not give a capital defendant the right to demand that the sentencer conclude that the evidence he proffers *does* mitigate the severity of his crime or background and that this evidence *so* mitigates the severity of his offense or background that he can *not* receive the death penalty. The state may impose the death penalty for the crime of murder, *Gregg v. Georgia, supra,* 428 U.S. at 187, 96 S.Ct. at 2931. The defendant's right to introduce evidence he hopes will mitigate the severity of his crime or background is designed to ensure that the jury will be able to base its decision on all the evidence that the defendant considers relevant to sentencing, *Lockett v. Ohio, supra,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, but is not the right to require the jury to impose a sentence less than capital punishment on the basis of any particular evidence the defendant introduces or on the basis of all the evidence the defendant introduces.

Finally, even if the undersigned were permitted by the Eighth Amendment to

engage in the analysis suggested by the petitioner, this ground should be rejected nevertheless. Despite the presence of the evidence that the petitioner has offered as mitigating, this sort of senseless, brutal crime against four helpless victims by a person who was lying in wait for his primary victim and murdered three other persons in order to leave no witnesses to his crimes presents an atrocious spectacle meriting the penalty imposed in this case. The calculated fashion in which this drama was enacted fully supports the conclusion that the petitioner acted with a malicious, evil and wicked intent to dispatch four fellow human beings to another existence to satisfy his own needs. The pitiless fashion in which he executed one of his victims, who was begging for her life, demonstrates that his only concern was for the satisfaction of his own need for violence and the death of his victims in order to escape responsibility for his total disregard for *their* right to life.

For the foregoing reasons it is RECOMMENDED that this petition for habeas corpus be DENIED and this suit be DISMISSED.